OPINION OF THE COURT
Meyer, J.
What constitutes “interrogation” of a suspect who, after Miranda warnings, has declined to answer questions is determined not by the subjective intent of the police, but by whether an objective observer with the same knowledge concerning the suspect as the police had would conclude that the remark or conduct of the police was reasonably likely to elicit a response.[1] Because applying that test we conclude that the conduct of the police in placing in front of the cell in which defendant was being detained furs stolen from the murder victim’s residence constituted interrogation and because no new Miranda warnings were administered to defendant Ferro, his statements made subsequent to viewing the furs should have been suppressed. The order of the Appellate Division should, therefore, be reversed, defendant’s motion to suppress those statements granted, and a new trial ordered.
*320 I
On December 5,1975, Lillian Sher was murdered in her home during the course of a robbery in which some furs were stolen. A week later, defendant Ferro was arrested for the murder and taken to the precinct station. After the reading of his Miranda rights to him, Ferro declined to answer any questions. Thereafter, while being held in a detention cell, he asked Detective Hudson whether he could speak to a District Attorney. Told by Hudson that, “You have to tell me what you want to talk to him about so I can relate that to him. Otherwise, he won’t come”, defendant said nothing further. Hudson then left the precinct.
When he returned, Hudson and his partner brought with them the stolen furs, which they had obtained from the apartment of a codefendant, Thomas Lewis. Without any verbal communication with defendant, the furs “were placed right in front of the cell a foot away from [Ferro].” Ferro then “grabbed ahold of the wire mesh with both hands and * * * said * * * ‘Hey, I got to talk to you.’ ” He again told Hudson he wanted to speak to a District Attorney, stating “I will tell you guys what you want to know if the D.A. can do something for me”. Hudson responded that neither he nor the District Attorney could do anything for Ferro. Hudson testified that there was one continuous conversation, which began as soon as the furs were placed on the floor in front of the cell. Its culmination was Ferro’s request to speak to an Italian detective.
Detective Walter Cassi was then asked to speak to defendant, and, approaching the detention cage, said “I am Italian. Do you want to say something.” Receiving a positive response, Cassi took defendant into the commanding officer’s room, where defendant said “I can’t afford to do a lot of time. What can I tell you?” Told by Cassi that he could promise nothing, but would pass on whatever was said to the District Attorney “and whatever they do that’s their business,” Ferro recounted that he had been told by a woman who was decedent’s next-door neighbor that decedent was giving her a great deal of trouble for which she wanted decedent robbed as a means of revenge, that he had told the neighbor he was not interested, and in response to her question whether he could get somebody to do so, had *321 responded only that he would think about it. Neither before the furs were placed in front of the detention cell nor before Cassi began his conversation with defendant in the commanding officer’s office were Miranda warnings repeated anew.
 The hearing Judge denied defendant’s motion to suppress and after a jury trial defendant was found guilty of felony murder. On appeal to the Appellate Division, defendant raised nine points, only one of which — the admissibility of the statements made to Cassi — was deemed by that court to merit discussion. The judgment was affirmed, two Justices dissenting, the majority characterizing the statements “as the self-serving efforts of an aging criminal to spare himself the remainder of his life in captivity, and not the result of psychological coercion or police behavior reasonably likely to elicit an incriminating response.” (92 AD2d, at p 303.) The case is before us by leave of one of the dissenting Justices. The People, citing People v Bryant (59 NY2d 786), argue that, the Appellate Division having affirmed, the suppression ruling may not be overturned by us. They argue, alternatively, that the Appellate Division majority was correct on the law. We disagree on both points and, therefore, reverse.
II
A.
As hereafter developed, the test is not whether the detectives in fact intended to interrogate defendant but whether an objective observer would conclude that the conduct of the detectives was reasonably likely to elicit a response from defendant. There being no dispute as to the facts and there being no other inference that could be drawn from the undisputed facts than that the police should have known that defendant was reasonably likely to respond to the placing of the furs before him by making a statement, the issue, unlike that in Bryant (supra), is not beyond our reach.[2]
*322 B.
Miranda v Arizona (384 US 436) requires not only that before interrogation can begin a suspect must be advised concerning his right to remain silent and of his right to counsel, but also that, “If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease” (id., at pp 473-474). Moreover, the rule being designed to counteract the coercive pressure of the custodial setting, a suspect’s right to remain silent, once invoked, must be “scrupulously honored” (id., at p 479; Michigan v Mosley, 423 US 96, 103-104; People v Wander, 47 NY2d 724, 725; see People v Grant, 45 NY2d 366, 373, 376). He may not within a short period thereafter and without a fresh set of warnings be importuned to speak about the same suspected crime (People v Gary, 31 NY2d 68, 70; Michigan v Mosley, 423 US 96, 106, supra; see People v Buxton, 44 NY2d 33, 37), but a statement volunteered[3] or spontaneously made will not be suppressible unless it is about the same crime and results from express questioning or its functional equivalent under circumstances which do not include fresh warnings and do not scrupulously honor the suspect’s right to cut off questioning (Rhode Island v Innis, 446 US 291, 300-301; Michigan v Mosley, supra; People v Bryant, 59 NY2d 786, supra).
As the Innis case makes clear, “the term ‘interrogation’ under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response” (446 US, at p 301). But, because “[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police” (id.), the question is not what was the subjective intent of the police but rather what words or actions, in light of their knowledge concerning the suspect, they “should have known were reasonably likely to elicit *323 an incriminating response” (id., at p 302 [italics in original]; White, Interrogation Without Questions: Rhode Island v Innis and United States u Henry, 78 Mich L Rev 1209, 1231-1236; Kamisar, Brewer v Williams, Massiah and Miranda: What Is “Interrogation”? When Does It Matter?, 67 Geo LJ 1, 19, n 115 [reprinted in Kamisar, Police Interrogations and Confessions: Essays in Law and Policy, pp 156-158, n 21]; McCormick, Evidence [2d ed], p 330).
In the context of the foregoing rule, defendant’s statements to Cassi must be suppressed. After the original Miranda warnings, defendant declined to answer questions. Although he thereafter asked to speak to a District Attorney, he abandoned that attempt when told that he first had to reveal to Hudson what he wanted to talk about. With the knowledge from defendant’s request to speak to a District Attorney that defendant had something on his mind that he wanted to talk about but would not reveal to him, Hudson, instead of acceding to defendant’s request that a District Attorney be called in, left and within a relatively short time returned with decedent’s furs, which were placed directly in front of defendant without any words being spoken. The immediate result was defendant’s further request to speak with a District Attorney, followed, in one continuous conversation, by his request for an Italian detective and his conversation with Cassi. Neither before the placing of the furs nor before Cassi’s conversation with defendant were fresh Miranda warnings given, although here, unlike the situation in People v Bryant {supra), there was both time enough to do so and clear reason, in light of the prior refusal to speak, for doing so.
On those undisputed facts, objectively considered, no other conclusion is possible than that, in causing the decedent’s furs to be placed where defendant could not help but see them, Hudson should have known, in light of defendant’s prior request to speak to a District Attorney, that doing so was reasonably likely to elicit from defendant an incriminating response. Where, as here, and as in Combs v Wingo (465 F2d 96,99) and United States v Barnes (432 F2d 89, 91), the only possible object of the police action in revealing evidence to a defendant is to elicit a statement *324 from him, it does no violence to logic to conclude that the police should have known that it would do so (see McCormick, Evidence [2d ed], op. cit.). Bearing in mind the placing of the furs before Ferro, the absence of further warnings to him and the relatively short time elapsed between his refusal to answer questions and the placing of the furs, we conclude that Ferro’s right to cut off questioning was not scrupulously honored.[4]
We have considered defendant’s other arguments for reversal and find them to be without merit.
For the foregoing reasons, the order of the Appellate Division should be reversed, defendant’s motion to suppress his statements made subsequent to his viewing of the furs granted and a new trial ordered.

. Not involved in the present case and, therefore, not reached by us, is whether the same test applies when the police conduct is in furtherance of routine administrative duties (see People v Prator, 93 Misc 2d 303; State v Grisby, 97 Wn 2d 493; cf. People v Bryant, 59 NY2d 786).

. Bryant involved a question addressed by one officer to another, overheard by defendant and to which he responded. Upon that scenario “reasonable minds may differ as to the inference to be drawn from the established facts” (People v McRay, 51 NY2d 594, 601; accord People v Harrison, 57 NY2d 470, 477). Here, as is more fully discussed below, no other inference can be drawn from the undisputed facts than that defendant was likely to respond by making a statement.

. Voluntariness — waiver in traditional terms — is to be distinguished (People v Grant, 45 NY2d 366, 374). A statement may in fact be wholly voluntary and yet inadmissible because the police action after the suspect cut off questioning did not comply with required procedures (id,.; Michigan v Mosley, 423 US 96, 100; Michigan v Tucker, 417 US 433, 443).

. The string of adjectives in the last paragraph of the dissent and of synonyms in the second paragraph on its page 325 overlooks the meaning of “scrupulous”, which is “correct to the smallest detail; punctiliously exact; painstaking, precise” (Webster’s Third New International Dictionary, p 2043). As Kamisar puts it, “If the police conduct is designed and likely to pressure or persuade * * * a suspect to incriminate himself * * * then that conduct is ‘compulsion’ as Miranda defines the self-incrimination clause” (67 Geo LJ 1, at p 23). The dissent’s interpretation oí Innis implies that the Supreme Court did not mean what it held in that case. We should not indulge in such speculation, particularly since Innis was decided but a few years ago.