THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MAN LEE LO, Appellant.

Fourth Department, July 11, 1986

226

## APPEARANCES OF COUNSEL

*Edward J. Nowak (Janet Somes* of counsel), for appellant.

*Howard R. Relin, District Attorney (Wendy Lehmann* of counsel), for respondent.

## OPINION OF THE COURT

BOOMER, J.

Defendant, Man Lee Lo, appeals from a judgment convicting him of the murder of his wife, Ching Ling, in Rochester, New York, on October 9, 1982. Although mostly circumstantial, the evidence of guilt was overwhelming.

Defendant owned and operated a Chinese restaurant in Rochester and his wife continued to live with her parents in New York City, where she was attending college. The wife left her parents' home on Friday, October 8, to visit her husband in Rochester and was to return on Sunday, October 10. On Sunday defendant telephoned his wife's sister in New York City and told her that his wife hurt her leg in an accident while they were in Toronto and that she would not return home until Monday. He called again that day and said that his wife was in the hospital and she would return on Tuesday.

Ten days later, on October 20, the wife's parents received two letters from defendant. He wrote that his wife died on Sunday morning, October 10, at 10:00 A.M. When he awoke that morning his mouth was full of poison and he saw a knife in his wife's brain. He explained that the night before first three Chinese and then a middle-aged American visited his restaurant and the American tried to kill him. Later that night the American came into his apartment and stabbed his wife. He blamed the killing on "politics". "Now it is avenged".

"On October 10th I give those Communists their own dose of medicine, and then I drank the chemical * * * I already did the revenge." As the result of drinking the chemical, he wrote, his mouth was severely burned and he spat blood for five days and nights.

Defendant gave a different explanation of his wife's death in a letter addressed to the editor of a Chinese newspaper in New York City. He wrote that the white man stabbed his wife, not at his apartment, but at the restaurant, then forced defendant to swallow poison and stabbed him three times in the head, causing him to faint. When defendant awoke he went to his apartment, where he found his wife's body. He again attributed the incident to Communist politics which "probably came from [his] wife's school".

Upon receiving the letters addressed to them, his wife's parents called the Rochester police and an investigator found Ching Ling's badly decomposed body in defendant's apartment. The apartment door was locked, there were no signs of a forced entry and defendant's bloody fingerprints were on an inside door. The medical examiner discovered two stab wounds in the right side of the victim's head and signs of suffocation. He concluded that the cause of death was either loss of blood or suffocation and the more likely and probable cause was suffocation.

At trial, defendant testified to another version of the killing. For the first time, he said that men approached him several times to force him to sell drugs in his restaurant. An American came first and returned in August and offered defendant 15% of the profits. Later, a black man repeated the offer. Finally, a white man came and said that a Chinese man would see him and explain the proposition.

At 8:30 P.M., on October 9, defendant testified, three Americans (not Chinese as he had written in his letters), whom defendant had never seen before, came to the restaurant and defendant waited on them because they frightened his wife. The men became angry when he refused to accompany them to a bar "to discuss things". His wife quarreled with them and the men told defendant to expect more trouble. At 10:20 P.M., a Chinese man (not an American, as he had written) entered the kitchen and in Chinese asked for his wife. When defendant got his wife and returned to the kitchen, the Chinese man put a knife to his wife's throat. She struggled and the Chinese man pushed her away and stabbed defendant in the

head at least twice. The man said defendant knew too much and he poured a cup of lye into defendant's mouth. Defendant blacked out from the pain caused by the lye and when he awoke, his wife was with him and the knife was nearby. His mouth was burned and he could not speak. He tried to call the police, but he could not talk to them.

He further testified that at about 11:15 P.M. his wife drove him home, washed the blood from him and then she took a bath. After she finished her bath, defendant answered a knock at the door. At the door was the same Chinese man who had attacked defendant and his wife at the restaurant. The man displayed a gun and told defendant that he was going to take defendant to see his boss. Defendant's wife called loudly for help and begged for her life. The man grabbed her, and defendant tried to stab him with a knife he had taken from a desk, but instead he mistakenly stabbed his wife on the right side of her head. She fell to the floor and continued to plead for her life. To silence her, the man forced defendant, at gunpoint, to hold a pillow over her face. As this was done, she lay quietly. When the man left, she awakened, asked for water and said she had to vomit. Defendant helped her to the bathroom, where her face blackened and she collapsed and stopped breathing.

Continuing his testimony, defendant said that after his wife collapsed, he washed, dressed and tried to use a public telephone to call the police, but the telephone was broken. He did not seek help from his neighbors because he thought they would accuse him of killing his wife. Instead, he went to his restaurant and tried to call a friend, but he could not speak. There he passed out. He awoke at noon the next day, returned to his apartment, then drove to Buffalo to visit a friend. While there, he could only make weak sounds. He sought revenge, so he returned to Rochester and soon left for New York City where he visited Chinatown to talk to another friend who knew about the Red Guard. On October 12, he returned to Rochester and covered his wife's body with a blanket. He did not contact the police because he was afraid they would interfere with his plans to seek revenge. He then left for Philadelphia and from there he went to a friend's restaurant in southern New Jersey, where he was found by the police.

Not only was defendant's testimony inherently incredible and, as noted, impeached by the inconsistent statements made in his letters, it was also contrary to the physical evidence and to the testimony of other witnesses. Defendant testified that

he stabbed his wife once, by accident, yet the medical examiner found two separate stab wounds, one vertical and one horizontal. He testified that while at his restaurant he was forced to drink lye, causing him to become speechless and to spit blood for five days, and that he was stabbed three times, yet he was driven home by his wife without any attempt to seek medical treatment, even though there was a hospital directly across the street from the restaurant. When he was examined by a physician after his arrest, the physician found no evidence of injuries caused by ingestion of lye or by stabbing. The day after he allegedly swallowed the lye, he had no difficulty speaking to his sister-in-law over the telephone.

Discrediting defendant's claim that he operated his restaurant on the day of the murder, a shopkeeper in an adjoining building testified that the restaurant was closed that day. This testimony was confirmed by defendant's records. Two neighbors, whose apartments adjoined defendant's, heard the victim whimpering and screaming on the night of her death, and neither one heard or saw any evidence of an intruder. Defendant testified that his wife lay quietly as he covered her face with the pillow, yet the medical evidence shows that she struggled as she was being suffocated.

Also contributing to the proof of defendant's guilt were the "will" received in evidence and the testimony of defendant's employees. In the "will" defendant wrote that he hoped his wife would help him at the restaurant, but her parents wanted her to study and that defendant and his wife were suffering so much that only death would bring happiness. The restaurant employees testified that defendant complained many times that his wife was not helping him at the restaurant, that defendant and his wife argued because he wanted her to stay in Rochester but she wanted to finish college, and that during one of the arguments defendant struck his wife with his fists. They also testified that they never heard defendant complain about Communists or drug dealers.

■ Confronted with this overwhelming evidence, the jury obviously concluded that there was no intruder and that defendant twice stabbed his wife in the head, held a pillow over her face until she suffocated, and fled to escape arrest. From this evidence, and after examining defendant's claims of error, we conclude that the conviction of murder in the second degree should be affirmed.

■ We reject defendant's principal claim that a statement

he made to a police officer in the absence of a *Miranda* warning should have been suppressed as the product of police interrogation. As defendant was being driven back to Rochester by the police, he started to cry and said, "You help me. I do terrible thing." The suppression court concluded, as do we, that the statement was spontaneous and not the product of police interrogation or its functional equivalent. The facts developed at the suppression hearing and found by the suppression court are that while en route to Rochester, one of the officers commenced "small talk" with the defendant by asking defendant three questions. He asked defendant how old he was and then asked him about his family in New York City, his mother and father. In reply, defendant gave his age and said he had a good mother and father. Finally, the officer asked him how he had arrived in New Jersey and defendant said he took a bus and no one helped him. Following this answer there was a pause and some time elapsed before defendant started crying and made the statement that he did a "terrible thing". The officer did not ask defendant what he meant by his statement, nor at any time during the long ride did he ask defendant any questions about the death of his wife.

The test in determining whether defendant's statement was spontaneous is whether it resulted from any words or acts of the officer that he should have known were reasonably likely to elicit an incriminating response *(see, Rhode Is. v Innis,* 446 US 291, 301; *People v Ferro,* 63 NY2d 316, 319; *People v Lynes,* 49 NY2d 286, 295).[1] Here it cannot be said as a matter of law either that defendant's statement was elicited by the words used by the officer or that the officer should have known that his words were reasonably likely to elicit an incriminating response.

We find as a question of fact that defendant's statement was not the result of the officer's questions. It was made after the questions were fully answered and after an appreciable pause, and the statement was similar to defendant's previous remarks made in the absence of any questions.[2]

We also find as a question of fact that, under all of the

---

1. To be distinguished is the test in the right to counsel cases *(see, People v Bryant,* 59 NY2d 786, 788). Here, defendant did not ask for counsel, nor had his right to counsel attached.

2. On several occasions, following periods of silence, defendant had turned to the officer and said, "Help me".

circumstances, the questions asked by the officer were not such that he should have known they were reasonably likely to elicit an incriminating response. None of the questions concerned the death of defendant's wife and, as the suppression court found, they were merely an effort on the part of the officer to engage in "small talk". As the officer explained, he asked the questions "just for conversation" as they "were sitting in the back of the car and after a long period of silence". Further indications that the officer did not intend to interrogate defendant were that he did not ask defendant what he meant by his statement and that never, during the long ride to Rochester, did he ask any questions about the crime. Although the officer's intent is not the controlling test, "[t]his is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response" *(Rhode Is. v Innis,* 446 US 291, 301-302, n 7, *supra).*

Even if we were to conclude that the admission of defendant's statement, "Help me. I do terrible thing", was error, it was harmless. Defendant's statement added nothing of significance to his testimony and was consistent with what he told the jury; thus, there was no "reasonable possibility that the [receipt of the statement] * * * contributed to defendant's conviction" *(People v Crimmins,* 36 NY2d 230, 237). He admitted that he stabbed his wife, albeit by accident. He admitted that, in fear of his own safety, he placed the pillow over her face, which resulted in her suffocation. Finally, he admitted that he permitted her body to remain undiscovered in the apartment for 10 days as it decomposed. Certainly, any one of these acts was a "terrible thing", and defendant acknowledged that his acts were "terrible" when he told the jury that he felt responsible for his wife's death because she died by his side and that he felt so responsible that he intended to commit suicide.

■ Contrary to the conclusion reached by the dissent, we find no error in the charge on circumstantial evidence. Defendant's request to charge that the People must prove each circumstantial fact upon which they rely beyond a reasonable doubt was properly denied. Although the People must prove each element of the crime beyond a reasonable doubt *(see,* CPL 70.20), there is no requirement that they prove each fact beyond a reasonable doubt. In determining whether the prosecution has met its burden of proof, the jury should not

consider each fact separately, but should consider the totality of the evidence. "The focus in a circumstantial evidence case is not the relative strength or weakness of any particular piece of evidence, nor is it necessary for each evidentiary segment to point only to the hypothesis of guilt *(People v White,* 41 AD2d 629, affd 33 NY2d 996). Rather, the evidence must be considered in its entirety *(People v White, supra)"* *(People v Gallo,* 75 AD2d 148, 153).

■ The court's charge on the burden of proof, viewed as a whole, does not compel reversal. Although at one point the court referred to "equally balanced scales", it clearly explained to the jury, at least a dozen times, that the burden of proof was upon the People to prove defendant's guilt beyond a reasonable doubt *(see, People v Navarro,* 104 AD2d 958, 959; *People v Webb,* 97 AD2d 779).

None of the other issues raised by defendant warrant reversal. The claimed errors, if errors at all, are either unpreserved or harmless. Accordingly, the judgment should be affirmed.

CALLAHAN, J. (dissenting). We would reverse. In our view, the circumstantial evidence of defendant's guilt is not overwhelming and the admission of defendant's statement to a police officer that he did a "terrible thing" was both erroneous and not harmless.

No one contests the suppression court's finding that the defendant was in custody when he made the statement at issue. We agree, given the circumstances and atmosphere presented, a reasonable man, innocent of any crime, would have believed he was in custody *(see, People v Yukl,* 25 NY2d 585, 589, *cert denied* 400 US 851; *People v Parks,* 120 AD2d 920). It is further conceded that no *Miranda* warnings were administered by the police investigators who had traveled from New York State to New Jersey to pick up defendant and who would have placed him under arrest if he refused voluntarily to accompany them. We disagree, however, with the majority's finding that defendant's statements were made in the absence of police questioning or its functional equivalent.

The admissibility of such statements made in the police car, prior to any *Miranda* warnings, turns on whether they were "the product of 'express questioning or its functional equivalent' " *(People v Bryant,* 59 NY2d 786, 788, quoting *Rhode Is. v Innis,* 446 US 291, 300-301; *see also, People v Ferro,* 63 NY2d 316, 322-323; *People v Huffman,* 61 NY2d 795,

797). Because "[t]he latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police" *(Rhode Is. v Innis, supra,* p 301), the question is not what was the subjective intent of the police but rather what words or actions, in light of their knowledge concerning the suspect, they " *'should have known* were reasonably likely to elicit an incriminating response' " *(People v Ferro, supra,* pp 322-323, quoting *Rhode Is. v Innis, supra,* p 302 [italics in original]).

The police investigator who was from the Town of Brighton where the homicide occurred and who was without question investigating defendant's wife's murder admitted that during the course of the automobile ride he asked defendant several questions, including one inquiry about defendant's "family". Almost immediately following this inquiry, defendant responded "You help me. I do terrible thing." In our view, the police officer's questions amounted to more than just casual conversation or "small talk" as characterized by the majority and constituted "express questioning or its functional equivalent" *(Rhode Is. v Innis, supra,* pp 300-301). In light of the police knowledge of defendant, including his distraught emotional state and their suspicions of his involvement in his wife's death, we conclude that they should have known their questions were "reasonably likely to elicit an incriminating response from the suspect" *(see, Rhode Is. v Innis, supra,* p 301; *People v Ferro, supra,* pp 322-323). Therefore, in our view, the statements made by defendant in response to the officer's questions without benefit of *Miranda* warnings should have been suppressed *(People v Ferro, supra; People v Parks, supra).*

The introduction of this statement at trial was prejudicial to the defendant. This error cannot be viewed as "harmless" as the proof was entirely circumstantial and only inferentially identified the defendant as the perpetrator of these acts. It was the defendant who identified himself as the one who stabbed and suffocated his wife. Defendant's statement that he did a "terrible thing" could well have been interpreted by the jury as a clear admission of guilt supporting the defendant's testimony that he stabbed and suffocated his wife while at the same time, undermining his claimed defenses. Since this constitutional error might have contributed to the defendant's conviction *(People v Crimmins,* 36 NY2d 230, 237), a new trial is required.

We also find merit to defendant's claim that the court's charge to the jury was erroneous and misleading in a number

of significant respects. The majority opinion discusses only one aspect of the court's charge with respect to circumstantial evidence. On appeal, defendant claims that the court's charge on circumstantial evidence was deficient as a matter of law for several reasons. The court instructed the jury that "If the conviction rests alone on circumstantial evidence, then the *direct* evidence must exclude to a moral certainty every *supposition* except that of the guilt of the accused" (emphasis added). In our view, this instruction attempting to convey the exclusion concept was both confusing and inadequate *(see, People v Ford,* 66 NY2d 428, 433). It would have been more accurate had the court's instruction on circumstantial evidence stated that the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them, and that the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence *(see, People v Ford, supra,* pp 441, 443; *People v Sanchez,* 61 NY2d 1022, 1024; *see also,* 1 CJI [NY] 9.05 p 475). Furthermore, the court should have charged, as requested by the defendant, that the People must prove each circumstantial fact upon which they rely by direct evidence beyond a reasonable doubt. Since the proof of defendant's guilt was largely circumstantial, defendant was entitled to a proper instruction on circumstantial evidence.

"It is the duty of a trial judge to instruct the jury to the effect that in its deliberations upon the question of the defendant's guilt or innocence it may consider the question of the defendant's motive *or lack of motive* to commit the crime charged." *(People v Sangamino,* 258 NY 85, 88; emphasis added; *see also, People v Seppi,* 221 NY 62.) Here, the court instructed the jury that "If you find certain evidence concerning a motive, then you may take that evidence into consideration in determining the issues in this case." However, the court refused defendant's request that they should consider the "lack of evidence of a motive as a factor in reaching its verdict". This was a proper request *(see,* 1 CJI [NY] 12.15 p 703) and should have been charged. While it is true that motive is not an essential element of the crime which need be proved by the People, the question of motive or lack of motive is always a question for the serious consideration of a jury in determining defendant's guilt or innocence *(People v Sangamino, supra).*

We also note the court's reference in its charge to "evenly balanced scales" when discussing the burden of proof. Such language is improper in a criminal trial as it creates the

impression that the burden of proof is something less than guilt beyond a reasonable doubt *(see, People v Wade,* 99 AD2d 474; *People v Ortiz,* 92 AD2d 595; *People v Melville,* 90 AD2d 488, 489; *People v McCray,* 57 AD2d 632). Such an instruction is misleading and should have been avoided *(People v Navarro,* 104 AD2d 958, 959).

For reasons stated herein, the conviction should be reversed and a new trial granted.

DILLON, P. J., and LAWTON, J., concur with BOOMER, J.; CALLAHAN and BALIO, JJ., dissent and vote to reverse the conviction and grant a new trial in an opinion by CALLAHAN, J.

Judgment affirmed.