OPINION OF THE COURT
Anne G. Feldman, J.
Defendants are two of four men charged with the robbery of *381 a Burger King restaurant and with the rape and sexual abuse of the two employees present at the time.
While in custody at the police precinct, both defendants (at separate times) made inculpatory statements which the prosecution seeks to introduce against them at trial. Each moves to suppress his statement, claiming it was obtained in violation of his right to counsel. The People contend that the statements were spontaneous and therefore admissible. After a Huntley hearing, defendants’ motions are granted and their statements suppressed.
FINDINGS OF FACT
Early in the morning of March 19, 1988, defendant James was arrested at his home and transported to the 81st Precinct where he was taken to a small office and cuffed and shackled to a chair. At the request of the arresting officer defendant’s wife, Patricia Walls, followed him to the precinct in a separate police car.
The prosecution concedes that both arresting officers (Detectives LaMorte and Randuzzi) were aware when they arrested James that he had a similar robbery case pending in Manhattan. Nonetheless they made no effort to contact or to learn the name of defendant’s attorney in that case.[1] Instead, LaMorte, in accordance with what she implied was her usual procedure, advised James of his Miranda rights. He responded that he wished to speak with her about the case. According to both detectives, after being advised of the charges, James stated, "I did the robbery but I didn’t do no rape.”[2] Thereafter LaMorte left the room to speak with defendant’s wife while Randuzzi stayed with James.
LaMorte said that when she informed a distraught Walls of the charges against her husband, Walls asked to see him. However, the court finds more credible Walls’ testimony that at LaMorte’s suggestion Walls accompanied LaMorte into the office where defendant was detained.
LaMorte acknowledged that with pad in hand, she stood "a few feet away” from the couple and recorded the following conversation between them:
*382 "Walls: How could you do that to my girl friend?
"Defendant: I did the robbery but I didn’t rape her. Eddie and Mark raped her.
"Walls: Who was all there?
"Defendant: Eddie Viera, Mark Smith and my cousin, Mark.
"Walls: Look at you now, you are in chains in here and they are out — you are an ass hole.”
The circumstances under which defendant Denny made a statement are similar. LaMorte testified Denny was taken into custody at his grandmother’s house and brought to the precinct a few hours after James’ arrest; that although she was aware he was one of James’ codefendants in the pending Manhattan robbery case, she nevertheless read him his Miranda warnings in the absence of counsel; and that like James he made a statement, claiming: "I didn’t do that one — I heard Mark Smith [a third perpetrator] raped her.”
CONCLUSIONS OF LAW
A custodial suspect, represented on a pending unrelated matter, cannot waive his right to counsel in the absence of that counsel (People v Rogers, 48 NY2d 167, 173 [1979]). The importance our State’s highest court attaches to the right of counsel is highlighted by the extension of this rule against uncounseled waiver: where the police have actual knowledge of a pending unrelated case against a suspect they are assumed to know he is represented by an attorney and may not question him in the absence of that attorney (People v Bartolomeo, 53 NY2d 225 [1981]). If a custodial suspect who has invoked his right to counsel by way of another pending case nevertheless makes an incriminating statement, it will be admissible against him only if it is held to be spontaneous (see, People v Maerling, 46 NY2d 289 [1978]).
In this case both defendants were in custody at the time they made statements, and the arresting officers were aware from the outset that they had pending felony charges. Accordingly, for both men their indelible right to counsel had attached and no valid waiver could have been obtained from them in the absence of their attorneys (People v Grimaldi, 52 NY2d 611, 616 [1981]).
The prosecution, seeking to avoid the imposition of the Rogers — Bartolomeo rule, contends that both defendants made their statements spontaneously and not as the result of police *383 interrogation or invitation. However, the evidence refutes that argument.
A genuinely spontaneous statement is one blurted out without any "inducement, provocation, encouragement or acquiescence, no matter how subtly employed” (People v Maerling, supra, at 302-303). Although the police cannot be expected to prevent an uncontrollably talkative person from making an incriminating statement (People v Rivers, 56 NY2d 476, 479 [1982]), a statement will not be classified as spontaneous merely because it was not made in response to direct or formal interrogation (People v Lucas, 53 NY2d 678, 680 [1981]). It must also not be the product of what is essentially an interrogation or its " 'functional equivalent’ ” (People v Stoesser, 53 NY2d 648, 650 [1981]).
Miranda v Arizona (384 US 436) requires that before interrogating a suspect in a custodial setting, the police must advise him of his right to remain silent and of his right to counsel, and then must ask whether he wishes to waive these rights. However, a "waiver of a constitutional right will not be deemed 'voluntary’ unless the police have 'scrupulously honored’ the suspect’s prior assertion of his rights” (People v Cunningham, 49 NY2d 203, 207 [1980]).
Viewed within this context defendants’ statements to Detective LaMorte after Miranda warnings cannot be considered either as voluntary or genuinely spontaneous. At the time Detective LaMorte gave them Miranda warnings defendants’ right to counsel had already attached by virtue of their pending cases. The arresting officers were fully aware that the existence of those cases precluded them from questioning defendants in the absence of counsel. Under such circumstances LaMorte’s motive in reading defendants’ Miranda warnings could only have been to elicit incriminating statements. The Miranda warnings thus become the "functional equivalent” of forbidden interrogation (see, People v Ferro, 63 NY2d 316 [1984]).
Defendant James’ second statement (to his wife) is also suppressed. The product of an orchestrated scene designed to elicit an incriminating response, it was obtained in violation of his right to counsel. In People v Ferro (supra), the police placed stolen furs before a detained suspect who had already invoked his Miranda rights. Holding that this constituted impermissible interrogation, the Court of Appeals framed the controlling standard to be "whether an objective observer with *384 the same knowledge concerning the suspect as the police had would conclude that the remark[s] or conduct of the police was reasonably likely to elicit a response” (supra, at 319).
In this case, having already garnered one inculpatory statement from James, the police sought another. After describing the crimes with which he was charged to defendant’s wife — a friend and co-worker of the victims — they encouraged her to speak with him in a small office in the presence of at least one openly eavesdropping police officer. Predictably, she confronted him not with words of concern or support but with bitter accusations, based upon information Detective LaMorte had just given her.[3] Not surprisingly, this staged emotional confrontation between defendant and his wife triggered further inculpatory statements from him.
Such police conduct certainly falls within the boundaries set in Ferro (supra) and mandates the supression of any statement so obtained.

. James’ attorney arrived at the precinct at 2:15 p.m. He testified credibly that he had been called by Walls at 1:00 p.m. and had called the precinct and instructed Randuzzi that his client not be questioned.

. This court does not credit defendant’s testimony that no warnings were read to him and that he made this statement after being slapped across the face and kicked in the stomach.

. Clearly Detective LaMorte expected defendant to make statements since she accompanied defendant’s wife into the room, prepared to record their anticipated conversation.