Titone, J.
(concurring in part and dissenting in part). I agree that there should be a reversal because of the Appellate Division’s error in declining to review a portion of defendant’s right to counsel claim as unpreserved. I would go further, however, and hold that, as a matter of law, the record before us establishes a clear violation of the principles outlined in People v Ermo (47 NY2d 863) and People v Cohen (90 NY2d 632). Accordingly, rather than remitting for what I regard as an unnecessary revisiting of the record by the courts below, I would simply reverse, direct suppression of the illegally obtained statements and order a new trial.
Initially, the majority’s suggestion that the lower courts *993 should be given an opportunity “to apply the law as articulated in Cohen to the facts and inferences presented by the existing record” (id.) is, in my view, based on the insupportable assumption that “reasonable minds may differ as to the inference [s] to be drawn from the established facts” (People v McRay, 51 NY2d 594, 601; see, People v Ferro, 63 NY2d 316, 321, n 2).[1] As will be discussed more fully below, this is a situation in which there is “no dispute as to the facts and * * * no other inference that could be drawn from the undisputed facts” than that the police purposefully exploited their patently improper questioning about the Brooklyn arrest to aid in their interrogation about the Schenectady homicide (see, People v Ferro, 63 NY2d 316, 321, supra). Thus, contrary to the majority’s suggestion, the fact that the Ermo-Cohen issue was not considered by the courts below does not pose a legal impediment to our determination of that question. Indeed, under the circumstances, a remittal would serve no useful purpose, because the outcome would be foreordained.
I.
Because the salient facts are not developed in the majority’s writing, a somewhat more detailed review of the events surrounding defendant’s interrogation is required. The prosecution at issue arises out of an incident that occurred in the City of Schenectady on May 9, 1993. According to the evidence below, the incident began when defendant, a native of Brooklyn, was attacked and robbed by one Reginald Barnhill and one Chester Ketchmore, while their acquaintance, Michael Wilson, stood nearby. After the robbery, defendant enlisted the aid of several local acquaintances in an effort to retake his property and obtain revenge. According to the People’s theory, defendant, accompanied by another unidentified individual, eventually located Wilson and Barnhill and shot them, killing Wilson and leaving Barnhill seriously injured.
After the shooting, defendant returned to Brooklyn. He was arrested in that borough on May 28, 1993 for unlawfully possessing a 9 millimeter Clock pistol. He was arraigned on that charge and quickly released, enabling him to travel back to *994 Schenectady. In the interim, the Schenectady police had discovered that the murder weapon used in the May 9, 1993 shooting was a 9 millimeter Glock pistol and that an unidentified person meeting defendant’s description might have been involved in the shooting.
Accordingly, upon his return to the upstate city, the Schenectady police briefly questioned defendant, leading to the discovery of his identity and the fact that he had been arrested in Brooklyn on May 28th for possession of an unidentified weapon — a weapon which defendant falsely told them was a .380 caliber gun. Subsequent conversations between the Schenectady and Brooklyn authorities revealed that the Brooklyn possession charge had actually involved the same 9 millimeter Glock pistol that had been used in the May 9 shooting. Armed with this information, the Schenectady police located defendant on July 13, 1993 and arrested him on a parole violation warrant arising out of the May 28th arrest in Brooklyn.
Defendant was initially interviewed by Investigator Sims, who had earlier been told that defendant had been assigned a Legal Aid attorney to represent him on the Brooklyn weapon possession charge. Sims first engaged defendant in casual conversation and then directed the discussion to the subject of guns and the Brooklyn arrest. Having given defendant Miranda warnings, Sims asked him whether he “had any problems * * * down in the City,” whether he had ever owned a gun, whether he was familiar with guns, whether he knew “the difference between the types of guns” and whether he knew “what an automatic is.” After defendant described the characteristics of an automatic, the officer pursued the subject, asking whether defendant owned such a gun “under [his] name” and, most pointedly, whether defendant had ever “had trouble with a gun in New York State.” In response, defendant revealed that he had been arrested in the City for gun possession, prompting Sims to ask for a description of the gun. At that point, defendant admitted that he had been arrested for possession of a black Glock pistol. During the same session, Investigator Sims asked defendant about the events of May 9, 1993.
Sims then took a narrative statement from defendant, which was reduced to writing, describing chronologically the events from the May 9 confrontation, including his receipt of the gun, through his return to Brooklyn and subsequent arrest. The written statement describes the attack in which defendant had been robbed, defendant’s attempts to enlist his friends’ aid in *995 obtaining revenge and the friends’ search for the perpetrators. According to this version of events, defendant had waited in a hotel until his friends confirmed that “they shot the kid up” and then gave him the Glock pistol that had been used in the shooting “to get rid of it.” Defendant denied knowing that the shooting had involved a fatality, but admitted having taken the Glock back to Brooklyn, where he remained until he was arrested with it on May 28th.
In response to expressions of skepticism and pressure regarding the details of his first statement, defendant then gave a second written statement in which he acknowledged that he had supplied the weapon and that he had been present at the Schenectady shooting. He continued to maintain, however, that another individual named Nez was the shooter. All of defendant’s oral and written statements were admitted against him at trial.
II.
The majority apparently concludes that these facts are too ambiguous to enable the Court to draw the conclusion that suppression of defendant’s inculpatory statements was required as a matter of law. In my view, however, there is no ambiguity and no serious question as to how the established legal principles should be applied to the undisputed evidence on the record.
The New York State constitutional right to counsel is based on the recognition that “the presence of an attorney is the most effective means we have of minimizing the disadvantage at which an accused is placed when * * * confronted with the awesome law enforcement machinery possessed by the State” (People v Cunningham, 49 NY2d 203, 207; see, NY Const, art I, § 6). Because of the critical equalizing role that counsel plays, this Court has developed a body of right-to-counsel case law that is “far more expansive than the Federal counterpart” (People v Bing, 76 NY2d 331, 339).
Where a represented suspect is questioned on a new matter for which the right to counsel has not independently attached, this Court has required suppression of the statements on the new matter in two circumstances. First, suppression is required where “the represented and unrepresented crimes [are] so thoroughly interrelated that questioning on one will almost necessarily elicit incriminating responses on the other” (People v Cohen, 90 NY2d 632, 639, supra; see, People v Townes, 41 NY2d 97; People v Vella, 21 NY2d 249; see also, People v Carl, *996 46 NY2d 806). Second, a statement may be subject to suppression where impermissible questioning on a represented charge was, when viewed as an integrated whole, not fairly separable from otherwise permissible questioning on the unrepresented matter and was, in fact, purposely exploited to aid in securing inculpatory admissions on the latter (see, e.g., People v Cohen, supra, at 641; People v Miller, 54 NY2d 616; People v Ermo, supra).
We are in agreement that the first of these grounds of suppression was not implicated here since the Brooklyn and Schenectady charges were not so interwoven in terms of their temporal proximity and factual interrelationship that any interrogation on the latter would “almost necessarily” elicit statements pertaining to the former (see, People v Cohen, supra, at 638-640; People v Townes, supra, at 104). As to the second ground, however, the inquiry in this case must go further.
It is beyond dispute that, regardless of his intentions, Investigator Sims acted improperly when, knowing that defendant had counsel for the Brooklyn weapon charge, he nonetheless initiated a series of questions which would necessarily lead to responses that would incriminate defendant directly on the Brooklyn weapon-possession charge. At the time those questions were asked, defendant’s “indelible” right to counsel had attached by virtue of the assignment of an attorney to represent him on that charge, and he could not thereafter be questioned about the charge without the advice of his attorney (see, People v Skinner, 52 NY2d 24). Thus, the only real question is whether the impermissible interrogation on the weapon charge was purposely exploitative in the sense that it was calculated to induce admissions on the unrepresented homicide charge (see, People v Cohen, supra; People v Ermo, supra). As to this question, there can only be one conclusion.
It is apparent from the record that the interrogation of defendant was an integrated whole from the initial explorations about defendant’s familiarity with guns to the police’s acquisition of the written statements inculpating defendant in the Schenectady shooting. Defendant’s oral and written statements encompassing admissions about both the Brooklyn and Schenectady crimes were given during the same interrogation session, and there were no circumstances indicating that the two lines of questioning were separate. Indeed, the interrogation flowed directly from the subject of defendant’s Brooklyn arrest to the events surrounding the Schenectady shooting and, finally, back again to the weapon arrest.
*997 Any doubt on the inseparability of the questioning is dispelled by Investigator Sims’s own testimony about the events following defendant’s arrest. Sims testified at the suppression hearing that immediately after he and defendant “talked in regard to what had transpired,” they “walked through” the first written statement together, with Sims writing down four or five sentences at a time and stopping to read them to defendant “to maintain a constant flow” and to ensure that “he would stay with the same momentum of the statement.” The second written statement, which also refers to both the Schenectady homicide and the Brooklyn weapon arrest, was obtained, in Investigator Sims’s own words, as a “continuation” of the first. Thus, the only inference that can be drawn from the record is that “the impermissible questioning * * * was not discrete or fairly separable” from the questioning on the unrepresented Schenectady charges (People v Ermo, supra, at 865; People v Cohen, supra, at 641; see, People v Miller, supra, at 618-619).
Additionally, and most critically, the record admits of no other inference than that the impermissible questioning about the Brooklyn arrest was exploited “in order to advance [the] interrogation regarding the homicide charge on which the defendant was unrepresented” (People v Cohen, supra, at 640). Investigator Sims probed the subject of the Brooklyn weapon-possession charge for which defendant had counsel until he obtained an admission that the weapon in question was not a .380 caliber gun as defendant had initially stated, but rather was the same type of weapon as was used in the Schenectady shooting. The conversation between Sims and defendant was extended into a discussion of the events of May 9, 1993, and the admissions thus obtained were then parlayed into a written statement which explained in narrative form how defendant first encountered Wilson and Barnhill, how he enlisted local acquaintances to help him retake his property and, finally, how he came to possess that 9 millimeter Glock and to bring it back to Brooklyn, leading to his arrest.
Since the Schenectady police were not responsible for, or even involved in, the investigation and prosecution of the Brooklyn weapon charge, the only inferable purpose for engaging in the impermissible line of questioning was to use it as leverage to obtain admissions regarding the Schenectady murder.[2] *998 By asking defendant about his possession of the murder weapon, Sims pressured him into either giving incriminating responses regarding his own use of that weapon in the Schenectady shooting or giving false exculpatory answers regarding his possession that could later be exploited in further interrogation.[3] Indeed, by purposefully eliciting admissions about defendant’s possession of the 9 millimeter black Glock, Sims set a trap from which there was no means of escape except through further inculpatory admissions about his role in the murder. The exploitative purpose of the questioning regarding the Brooklyn possession of the Glock pistol is even further demonstrated by the fact that the product of the constitutionally prohibited interrogation was actually introduced and used as evidence to convict defendant of the Schenectady murder.
For all of these reasons, I would hold that, as a matter of law, the statements defendant made to Schenectady investigators on July 13, 1993 should have been suppressed and defendant should have a new trial. Any contrary conclusions reached on remittitur would necessarily be erroneous and, thus, a recycling of this case through the lower courts would serve no useful purpose other than to delay the commencement of the inevitable new trial. The majority has offered no real rationale for adopting this course other than its reference to unspecified “prudential reasons” (majority mem, at 992). Notably, if the “prudential reasons” to which the majority alludes were a controlling factor, we would have had to remit in Cohen itself, the very case in which the newly formulated rule was articulated. We found no need for a remittal there, and I see no reason to break new ground here. Accordingly, I dissent from the Court’s holding and result.
Chief Judge Kaye and Judges Bellacosa, Smith, Ciparick and Wesley concur in memorandum; Judge Titone dissents in part in an opinion in which Judge Levine concurs.
*999 Order reversed, etc.

. The majority’s writing does not appear to contemplate a new hearing or any other procedural mechanism that would permit further development of the factual record. Indeed, authorizing the parties to add to the existing record would be a clear departure from our prior practice (see, e.g., People v Kinchen, 60 NY2d 772; People v Charleston, 54 NY2d 622; People v De Mauro, 48 NY2d 892 [all affirming without remitting because the factual record was insufficient to permit appellate review]).

. Significantly, Sims expressly disclaimed any intent to procure information related to the possession charge. When asked “were you in any way in your discussion with [defendant] attempting to gather evidence for the New York City Police Department”, he responded “[n]ot at all.”

. Although defendant evidently believed that his first statement denying participation in and knowledge of the shooting was exculpatory, the statement was actually highly damaging, since it confirmed the illegality of his possession of the Glock, established his connection with the shooting victims, established a motive for the Schenectady shooting and, finally, provided a fertile basis for impeachment in either prosecution. Moreover, the first written statement was immediately used as leverage to obtain the even more damaging admissions contained in defendant’s second written statement.