(May 27, 2003)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v EZEKIEL KOLLAR, Appellant. [760 NYS2d 449] —Judgment, Supreme Court, Bronx County (Martin Marcus, J., at suppression hearing; Patricia Williams, J., at jury trial), rendered February 2, 1999, convicting defendant of murder in the second degree and criminal possession of a weapon in the second degree, and sentencing him to concurrent terms of 22½ years to life and 5 years, respectively, reversed, on the law, the motion to suppress statements granted, and the case remanded for a new trial.

Defendant surrendered to police on the evening of January 5, 1997, after he learned that he was a suspect in the shooting death of a Bronx livery cab driver. At the precinct, at about 12:15 A.M. the next morning, the detective assigned to the case read defendant his *Miranda* rights. Defendant, handcuffed to a wall and alone in the precinct interrogation room with the detective, stated that he did not wish to answer any questions. Defendant testified at a suppression hearing that despite the invocation of his right to remain silent, the detective continued to question him about the shooting. However, the detective, an experienced police officer, testified that he specifically refrained from asking defendant any questions about the shooting but did engage defendant in conversation about unrelated personal matters specifically to establish a rapport with defendant and to induce him to change his mind and answer questions about the incident.

During the course of the conversation, defendant told the detective, among other things, that he had recently been released from the hospital where he had been treated for mental illness. About an hour later, at approximately 1:00 A.M., the detective, believing he had established a good rapport with defendant, again asked him if he wanted to answer questions about the shooting. This time, defendant agreed to do so.

The detective reread defendant his *Miranda* rights, and defendant provided the detective with a statement in which he admitted that he had attempted to rob the cab driver at gunpoint, that the cab driver resisted, and that the gun went off. Defendant further stated that he ran from the cab when he saw blood coming from the driver's head. The detective wrote the statement down, read it to defendant, and defendant signed it at approximately 1:30 A.M.

The detective then moved defendant to the squad room, where defendant was again handcuffed to the wall, and the detective attended to some paperwork. For the next 90 minutes or so, the detective continued to "converse" with defendant while they awaited the arrival of an Assistant District Attorney (ADA), who appeared at about 3:00 A.M. Following another reading of his *Miranda* rights, defendant was interviewed on videotape by the ADA. The detective who obtained defendant's initial inculpatory statement and who had been with defendant for the entire time was seated at defendant's side during the videotaped interview. Defendant's videotaped statement was essentially the same as the statement he previously provided to the detective, which the ADA held in her hands during the interview and referred to as the interview was being concluded.

Defendant contends that Supreme Court erred when it refused to suppress the written statement, which he asserts he made after being manipulated and subtly coerced into involuntarily waiving his constitutional right to remain silent and making an incriminating statement. Defendant further contends that the videotaped statement should also have been suppressed because it was not sufficiently attenuated from his initial involuntary written statement.

In *Miranda v Arizona* (384 US 436 [1966]), the Supreme Court held that, once an individual in custody has invoked his Fifth Amendment right to remain silent, all "interrogation" must cease: "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. * * * [A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has once been invoked." (*Id.* at 473-474.) Furthermore, the exercise of the right to remain silent must be "scrupulously honored" (*id.* at 479; *see also Michigan v Mosley*, 423 US 96, 103-104 [1975];

*People v Ferro,* 63 NY2d 316, 322 [1984], *cert denied* 472 US 1007 [1985]).

The question we must resolve is whether the police officer's engaging defendant in conversation specifically designed and intended to convince him to change his mind and waive his right to remain silent constitutes "interrogation" within the meaning of *Miranda v Arizona* (384 US 436 [1966]).

In *Rhode Island v Innis* (446 US 291 [1980]), the Supreme Court instructed that the "interrogation" that must cease once a suspect has invoked his Fifth Amendment rights refers "not only to express questioning, but also to any words or actions on the part of the police * * * that the police should know are reasonably likely to elicit an incriminating response from the suspect" (*id.* at 301; *see also People v Ferro,* 63 NY2d at 322). In addition, since the definition of impermissible interrogation is based upon words or actions the police knew or should have known would prompt an incriminating response, any knowledge the police may have about a suspect's particular susceptibility is important in determining whether the particular conduct was inappropriate (*Innis,* 446 US at 302 n 8). The Supreme Court also instructed that the definition of impermissible interrogation "focuses primarily upon the perceptions of the suspect, rather than the intent of the police" (*id.* at 301). This is so, the Court instructed, because *"Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, *without regard to objective proof of the underlying intent of the police"* (*id.* [emphasis added]). The Court went on to note that police intent may, nonetheless, be relevant in determining what the police knew or should have known: "This is not to say that the intent of the police is irrelevant, for it may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response. In particular, where a police practice is designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect." (*Id.* at 301 n 7.)

*People v Ferro* (63 NY2d 316 [1984]), cited by the dissent, is not to the contrary. In *Ferro,* the police wordlessly placed recovered furs that had been stolen from the murder victim's apartment in front of defendant's cell, where he could not avoid seeing them. Faced with incriminating evidence, defendant was prompted to make an incriminating statement. Echoing the Supreme Court's teaching in *Innis,* the Court of Appeals

determined that, since "the only possible object of the police action" was to elicit an incriminating statement from the defendant, "it does no violence to logic to conclude that the police should have known that it would do so" (*id.* at 323, 324). Therefore, the Court held, the defendant's statements that were elicited by the police conduct after the defendant had asserted his right to remain silent had to be excluded.

Application of the above principles leads to the conclusion that defendant's initial written statement should have been suppressed. When defendant had been given his *Miranda* warnings, he clearly stated that he wished to remain silent, thereby invoking his privilege against self-incrimination under the New York State and United States Constitutions. We accept Supreme Court's credence of the detective's testimony that he thereafter ceased questioning defendant about the shooting of the cab driver. However, the detective failed to "scrupulously honor" defendant's constitutional rights when he deliberately engaged defendant in conversation for the express purpose of inducing defendant to change his mind and make an incriminating statement. This is all the more so since the detective was armed with information about defendant's recent hospitalization for mental illness. The strategy was successful.

The dissent's characterization of the exchange between the detective and defendant as "benign conversation" begs the question. There was nothing benign about the conversation; it was specifically designed to and succeeded in subtly coercing defendant into waiving his right against self-incrimination.* In *Ferro*, a record that was silent as to the intent of the police prompted the Court of Appeals to surmise that the "only possible object" of the police conduct was to induce the defendant to make an incriminating statement. No such conjecture is required here, as the detective readily acknowledged that the object of his "conversation" with defendant was to induce him to waive his constitutional rights. Contrary to the dissent's suggestion, *nothing* in *Ferro* requires us to ignore that acknowledgment. The dissent's contention that the courts must

---

* Although we realize that trial testimony is not relevant to a review of the sustainability of a suppression ruling unless defendant has made an application to reopen the suppression hearing (*see e.g. People v Riley*, 70 NY2d 523 [1987]), we note, as background, the detective's trial testimony that, during his "conversation" with defendant, he told defendant—untruthfully—that the police had fingerprints on the car, and that he did so because he wanted defendant to "believe that we had certain evidence * * * that the game was over and the best course of action would be for him to confess." The detective's fabricated fingerprints were the functional equivalent of the stolen furs piled up in front of the suspect's cell in *Ferro*.

disregard evidence of police intent is apparently based upon language in *Ferro* that is taken out of context. However, a complete reading of the decision makes it clear that *Ferro*, consistent with *Innis*, teaches that determination of whether police conduct constitutes impermissible interrogation is to be made regardless of the subjective intent of the police, but not that evidence of such intent must be disregarded.

The detective knew that his words and actions were "reasonably likely to elicit an incriminating response from the suspect" (*Innis*, 446 US at 301); he frankly stated that they were consciously structured to do so. Those actions thus constituted impermissible interrogation. Because the detective's "conversation" with defendant constituted impermissible interrogation in violation of defendant's constitutional rights against self-incrimination, defendant's written statement, elicited by that conversation, should be suppressed.

The subsequent videotaped statement should also have been suppressed because it was not attenuated from the initial, involuntary statement. The Assistant District Attorney who took the videotaped statement had in her hand and referred to a copy of defendant's earlier statement to the detective. That same detective remained at the defendant's side throughout the questioning by the ADA.

Where a defendant is subjected to what amounts to a "continuous chain" of custodial questioning, he "may well be put in such a state of mind that the [additional] warnings which would ordinarily suffice will no longer be enough to protect his rights" (*People v Chapple,* 38 NY2d 112, 114, 115 [1975]). Only if there is such a "pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" (*id.* at 115) may the subsequent statements be considered attenuated from the original illegality.

Defendant was continually in the detective's custody and subjected to the detective's ongoing conversational interrogation for all but what amounted to a short period when the detective completed some paperwork. Although he was moved from the interrogation room to the squad room, that change did not constitute a break in the interrogation as defendant remained constantly under the absolute custody and control of the detective, from the moment he was given his initial *Miranda* warnings until the completion of the ADA's videotaped interview. If there was a brief "break" in the custodial questioning while the detective attended to paperwork, there was no break in defendant's custodial circumstances (*cf. People v Rod-*

*riguez,* 231 AD2d 477, 478 [1996], *lv denied* 89 NY2d 1099 [1997]). Nor does the fact that the ADA, rather than the detective, conducted the videotaped interview and reread the *Miranda* warnings establish a sufficient break in the custodial questioning in view of the detective's continued and constant presence at defendant's side during the taping (*see e.g. People v Robertson,* 133 AD2d 355 [1987]). Any relaxation in the chain of custodial interrogation in these circumstances cannot be said to have been sufficiently pronounced or definite so as to have returned defendant to the status of one no longer under the influence of the earlier questioning. (*People v Chapple,* 38 NY2d at 114-115.)

Because defendant's statements were a crucial component of the prosecution's case, the erroneous admission of those statements was not harmless (*People v Crimmins,* 36 NY2d 230, 237 [1975]).

In view of the foregoing disposition, we need not address defendant's remaining contentions. Concur—Saxe, Rosenberger and Williams, JJ.

Buckley, P.J., and Lerner, J., dissent in a memorandum by Lerner, J., as follows: The majority takes the position that defendant was subjected to an impermissible continuing interrogation after *Miranda* warnings were given inasmuch as the police officer engaged defendant in a conversation designed to elicit an inculpatory response. I respectfully disagree.

It is well settled that once a suspect invokes his or her right to remain silent, the police must scrupulously honor that decision and cease questioning (*see Michigan v Mosley,* 423 US 96 [1975]; *Miranda v Arizona,* 384 US 436 [1966]; *People v Ferro,* 63 NY2d 316, 322 [1984], *cert denied* 472 US 1007 [1985]). A subsequent inquiry, however, may be undertaken where a significant period of time has elapsed since the invocation of the right to remain silent and where the police have reiterated *Miranda* warnings (*see Michigan v Mosley, supra; People v Ferro, supra*).

In determining whether a suspect, who has invoked his or her right to remain silent after *Miranda* warnings have been administered, has been subjected to an impermissible continuing "interrogation," the courts must inquire into whether an objective observer with the same knowledge concerning the suspect as the police would conclude that the remark or conduct of the police was reasonably likely to elicit an inculpatory response. The subjective intent of the police is not a determinative factor (*see People v Ferro, supra*).

In light of the foregoing, I would conclude that defendant's

suppression motion was properly denied and find no basis upon which to disturb the hearing court's determinations of the police officer's credibility with its unique advantage of having seen and heard the witness (*see People v Prochilo,* 41 NY2d 759, 761 [1977]). The record supports the court's determination that defendant's refusal to answer questions was scrupulously honored (*see Michigan v Mosley, supra; People v Ferro, supra*), and that questioning was properly resumed after the fresh re-administration of *Miranda* warnings following a significant break, consisting of a 50-minute period during which the detective and defendant engaged in benign conversation (*see People v Ferro, supra* at 322; *People v Davis,* 287 AD2d 376 [2001], *lv denied* 97 NY2d 680 [2001]). Contrary to the majority's position, this conversation regarding personal matters unrelated to the underlying crime, when viewed objectively and without reference to any subjective intent the detective may have had, was not reasonably likely to elicit an incriminating response.

Assuming arguendo that defendant's written statement to the police should have been suppressed, I believe that any taint from this statement was sufficiently attenuated from the later videotaped statement made by defendant to an Assistant District Attorney, which followed a definite, pronounced break of one hour and 40 minutes and was preceded by another read-ministration of *Miranda* warnings (*see People v Chapple,* 38 NY2d 112 [1975]; *People v Morales,* 279 AD2d 362 [2001], *lv denied* 96 NY2d 803 [2001]; *People v Davis, supra; People v Dunkley,* 200 AD2d 499 [1994], *lv denied* 83 NY2d 871 [1994]). The detective's mere presence during the prosecutor's independent interrogation does not give rise to a single continuous interrogative enterprise.

I would also find that the evidentiary rulings by the trial court that are challenged on appeal were proper exercises of discretion (*see People v Aska,* 91 NY2d 979 [1998]; *People v Schwartzman,* 24 NY2d 241, 244 [1969], *cert denied* 396 US 846 [1969]). To the extent that defendant is raising constitutional claims regarding these rulings, I would find no violation of defendant's right to confront witnesses and present a defense (*see Delaware v Van Arsdall,* 475 US 673, 678-679 [1986]) and that any error in these rulings would be harmless in light of the overwhelming evidence of defendant's guilt (*see Chapman v California,* 386 US 18, 24 [1967]).