The People of the State of New York, Respondent, v Juan Tavares-Nunez, Appellant. [930 NYS2d 589]—

We agree with the defendant that his inculpatory statement to law enforcement officials made before the administration of *Miranda* warnings (*see Miranda v Arizona*, 384 US 436 [1966]) should have been suppressed. The hearing evidence revealed that a police detective, Detective Echeverria, interviewed a witness who informed him that, earlier that day, he had observed the defendant, an employee whom he supervised, engaging in oral sexual conduct with an incapacitated resident of the nursing home where the defendant and the witness worked, and that the defendant had been sent home early due to the incident. Detective Echeverria then proceeded to the defendant's home, where he identified himself as a detective and advised the defendant that he "needed to speak" with him. The detective informed the defendant that it was "inappropriate" to speak in the defendant's house, and that he "needed" to speak with the defendant in the detective's office. The defendant asked the detective what he needed to talk to him about, and the detective responded that he was a member of the Special Victims Squad and that he needed to speak to him about an incident that happened at the defendant's place of work. The defendant agreed to accompany Detective Echeverria to the police station and, on the way to the station, the detective advised the defendant that they would not be talking about the case in the car. Once Detective Echeverria and the defendant arrived at the police station, the defendant was placed in an "interview room," and the detective left to gather some paperwork. When Detective Echeverria returned, the defendant stated: "we're in your office, what do you want to talk about." Detective Echeverria explained that the defendant was at work that day and that "there was an

incident and [the defendant] had to leave early because of this incident and that's what [they] would be talking about." The defendant then proceeded to make an inculpatory statement, apologizing for his conduct.

Contrary to the People's contention, under the totality of the circumstances, the defendant was in police custody at the time he made the inculpatory statement (*see People v Baggett*, 57 AD3d 1093 [2008]; *People v Payne*, 41 AD3d 512, 513 [2007]; *People v Vachet*, 5 AD3d 700 [2004]; *see also People v Macklin*, 202 AD2d 445, 447 [1994]).

Further, the Supreme Court erred in concluding that the inculpatory statement was admissible because it was spontaneous, and not the result of interrogation or its functional equivalent. "[T]he special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation" (*Rhode Island v Innis*, 446 US 291, 300 [1980]). "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect" (*id.* at 301; *see People v Ferro*, 63 NY2d 316, 322 [1984], *cert denied* 472 US 1007 [1985]; *People v Huffman*, 61 NY2d 795, 797 [1984]; *People v Rivers*, 56 NY2d 476, 480 [1982]). Statements made in response to such police words or actions are inadmissible in the absence of *Miranda* warnings (*see People v Ferro*, 63 NY2d at 319).

In contrast, volunteered statements, meaning those that are "self-generated" (*People v Dunn*, 195 AD2d 240, 244 [1994], *affd* 85 NY2d 956 [1995]) and " 'made without apparent external cause,' " are admissible even if the defendant was in custody and unwarned (*People v Rivers*, 56 NY2d at 480, quoting *People v Stoesser*, 53 NY2d 648, 650 [1981]; *see People v Maerling*, 46 NY2d 289, 302-303 [1978]; *People v Dunn*, 195 AD2d at 244). For a statement to fall within that category, "the spontaneity has to be genuine and not the result of inducement, provocation, encouragement or acquiescence, no matter how subtly employed" (*People v Maerling*, 46 NY2d at 302-303; *see People v Rivers*, 56 NY2d at 479).

While a police officer's brief response to a defendant's query as to the basis of an arrest, or similar inquiry, often does not amount to the functional equivalent of interrogation (*see e.g. People v Davis*, 32 AD3d 445, 445-446 [2006]; *People v Harrison*, 251 AD2d 681, 682 [1998]; *People v West*, 237 AD2d 315 [1997];

*People v Pryor*, 194 AD2d 749, 749-750 [1993]), here, considering the totality of the circumstances leading up to the defendant's statement, we cannot say that, viewed objectively, the statement was genuinely "self-generated" and not the product of "an external cause" (*see People v Stoesser*, 53 NY2d at 650). The defendant was told by Detective Echeverria that he "needed" to speak to him, and was twice told that they would not speak until they reached the detective's office. Once they reached the office, the defendant, who had already been told that the subject of the interview was an incident that happened at work, observed that they were now in the detective's office and again asked what the detective needed to talk to him about. It is clear that the defendant expected that the interview had begun, and was not seeking information as to the general subject of the conversation, having already received that information. In other words, the facts indicated that an interrogational environment existed (*see People v Lanahan*, 55 NY2d 711, 712 [1981]; *People v Stoesser*, 53 NY2d at 650; *cf. People v Bryant*, 87 AD2d 873, 874 [1982] ["The record is devoid of any facts which would tend to indicate that an interrogational environment existed at the time defendant's statement was made"], *affd* 59 NY2d 786 [1983]). Moreover, Detective Echeverria's statement to the defendant, explaining that there was an incident at work and that the defendant had to leave early from work as a result of the incident was not, for example, a mere recitation of a charge upon arrest. Rather, it revealed to the defendant that the detective had spoken to individuals at the nursing home, who were aware, one of them having witnessed the incident, of the defendant's conduct (*cf. People v Lucas*, 53 NY2d 678, 680 [1981] [statement not spontaneous where it was made after police officer informed defendant that the District Attorney had obtained a statement from his alleged accomplice, accusing him of murder]). Not surprisingly, the detective's revelation prompted the defendant to apologize for his conduct.

In sum, from an objective standpoint, it was natural for the defendant to have believed that the interview with Detective Echeverria had begun and, not having been advised of his right to remain silent or to counsel, to respond to the detective's statement that they were going to talk about an incident at work that caused him to leave early, with a statement relevant to that incident. In other words, the detective's explanation and "the atmosphere in which it was uttered" (*People v Bryant*, 87 AD2d at 874-875), was of such a nature that the detective should have reasonably anticipated that it would evoke a response from the defendant. Prior to responding to the defendant's statement "we're in your office, what do you want to talk about," there

was "both time enough . . . and clear reason" to give the defendant *Miranda* warnings (*People v Ferro*, 63 NY2d at 323). Because the detective failed to do so before engaging in the functional equivalent of interrogation, the defendant was deprived of his constitutional rights, and the statement should have been suppressed (*see People v Ferro*, 63 NY2d 316 [1984]; *People v Lucas*, 53 NY2d at 680; *People v Howard*, 47 NY2d 988, 989 [1979], *affg* 62 AD2d 179 [1978]; *People v Robinson*, 38 AD3d 572, 573 [2007]; *People v Moore*, 96 AD2d 1044, 1044-1045 [1983]).

In addition, although "[t]he nature and proper scope of cross-examination is a matter generally left to the sound discretion of the hearing court" (*Matter of Andre S.*, 51 AD3d 1030, 1033 [2008]), here, the Supreme Court improvidently exercised its discretion in preventing defense counsel from cross-examining Detective Echeverria as to whether the defendant was free to leave the precinct at the time the statement was made. The determination of whether a defendant is in custody at the time of an interrogation does not turn upon the subjective intent of the police officer (*see United States v Mendenhall*, 446 US 544, 555 n 6 [1980]; *People v Joy*, 114 AD2d 517, 520 [1985]), but, rather, concerns "what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's position" (*People v Hardy*, 77 AD3d 133, 141 [2010]; *see People v Yukl*, 25 NY2d 585, 589 [1969], *cert denied* 400 US 851 [1970]). Nevertheless, the subjective intention of the police officer regarding whether a defendant is free to leave is relevant "insofar as that may have been conveyed to the [defendant]" (*United States v Mendenhall*, 446 US at 555 n 6; *see People v Bell*, 182 AD2d 858, 859 [1992]; *People v Joy*, 114 AD2d at 520). Thus, defense counsel should have been permitted to explore whether any intention on the part of the detective to hold the defendant in custody was communicated, verbally or otherwise, to the defendant (*see generally People v Pearce*, 81 AD3d 856, 856 [2011] [" '(e)vidence is relevant if it has any tendency in reason to prove the existence of any material fact' "], quoting *People v Scarola*, 71 NY2d 769, 777 [1988]).

Nonetheless, we find that these errors were harmless. At trial, the defendant's janitorial supervisor testified that he had been inspecting one of the floors of the nursing home when he noticed a bucket and mop unattended in the hallway outside a door which was slightly ajar. He testified that he looked inside the room and saw the defendant engaging in oral sexual conduct with an incapacitated resident of the nursing home. He then reported the incident to the nursing supervisor. The two supervi-

sors testified that the defendant admitted to them that he had engaged in oral sexual conduct with the victim. Under these circumstances, the evidence of the defendant's guilt, without reference to his pretrial statement, was overwhelming, and there was no reasonable possibility that the error in admitting the statement might have contributed to the defendant's conviction. Accordingly, the errors were harmless beyond a reasonable doubt (*see People v Crimmins*, 36 NY2d 230, 237 [1975]). Skelos, J.P., Eng, Austin and Miller, JJ., concur.