People v Morales (2026 NY Slip Op 50177(U))

[*1]

People v Morales

2026 NY Slip Op 50177(U)

Decided on February 17, 2026

Supreme Court, Kings County

Quiñones, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on February 17, 2026
Supreme Court, Kings County

People of the State of New York

againstLeonardo Morales, Defendant.

Indictment No. 72794-2025

Brooklyn Defender Services, Brooklyn, NY (Rian Henry of counsel), for the defendant.Eric Gonzalez, District Attorney, Brooklyn, NY (Erica Glenn and Alexis Lehman Assistant District Attorneys), for the People.

Joanne D. Quiñones, J.

The defendant is charged with Assault in the Second Degree and other offenses in relation to an incident alleged to have occurred on May 13, 2025. The defendant moves to suppress statement, identification, and physical evidence. This court conducted a combined Huntley/Dunaway/Mapp/Wade hearing on November 18 and December 17, 2025. The People presented three witnesses at the hearing: Police Officer Thomas Brown, Police Officer Olena Zubyk, and Sergeant Umid Karimov. The defense did not present any witnesses. After the testimony was concluded, the court heard oral arguments from both sides.
The court makes the following findings of fact and conclusions of law:Findings of Fact
Police Officer Thomas BrownPolice Officer Thomas Brown has been employed by the NYPD for approximately eight years and is currently assigned to the 61st Precinct (11/18/25 tr at 10-11). The court credits Officer Brown's testimony to the extent indicated herein.
On May 13, 2025, Officer Brown was working in uniform with his partner, Officer Zubyk (11/18/25 at 12). At approximately 10:13 a.m. that day, Officer Brown received a radio run for an assault involving the use of pepper spray (id. at 12, 29). Officer Brown responded to Coney Island Avenue in Kings County, a location he described as primarily commercial (id. at 12-13). 
Officer Brown's interactions on May 13, 2025, were memorialized on his body-worn camera (BWC), a copy of which was admitted into evidence as People's Exhibit 3.
Upon arriving at the location, an unidentified male approached Officer Brown and stated that he had been pepper sprayed (11/18/25 tr at 13-14, 32). At that time, the male stated that he was not injured, was not experiencing any problems, did not know what type of spray had been [*2]used, and did not complain of pain (id. at 30-32). The individual directed Officer Brown's attention to a bottle on the sidewalk outside the Coney Island Avenue location, which he stated was the spray that was used (id. at 13-14; Brown BWC at 2:08-2:16). The individual also pointed toward a nearby medical center, indicating that the person responsible for the spraying was inside (11/18/25 tr at 13-14). The individual, however, did not provide any description of the person who sprayed him or any details regarding the perpetrator's appearance (id. at 32). This unidentified male was the only witness Officer Brown spoke with prior to entering the medical center (id. at 32).
Officer Brown then proceeded to the medical center, located a few storefronts away, at which point a medical professional notified the officer that "he is in the bathroom . . . he was supposed to come see me, but I don't know what happened" (Brown BWC at 3:07-3:15; 11/18/25 tr at 14-15). Upon entering the medical center, Officer Brown observed "an individual who matched the description that was in the bathroom area" (11/18/25 tr at 13-15, 33). Officer Brown testified that he recognized the individual from a prior interaction but did not know his name at that time (id. at 15, 37). He later learned that the individual was Leonardo Morales, whom he identified in court as the defendant (id. at 15). 
Although Officer Brown testified that the defendant "matched the description," he also testified that he did not recall receiving any description of a suspect over the radio and had not been provided with information concerning the suspect's height, clothing, tattoos, distinctive marks, skin color, or hair style (11/18/25 tr at 28-29). Officer Brown further testified that, at that time, no witness had pointed out the defendant as the perpetrator (id. at 33).
Upon approaching the bathroom area of the medical center, the defendant noticed the officer and stated, "hey, you again?" (Brown BWC at 3:18-3:22). Officer Brown responded by directing the defendant to "come on step outside [of the bathroom] man" (Brown BWC at 3:22-3:24). The defendant replied, "wait, hold on, I got pepper spray in my eyes, hold on, give me a second. I'm not hiding from nobody . . . I got a doctor appointment . . . I'm here to see the doctor . . . I have high blood pressure. I harmed nobody" (Brown BWC at 3:24-3:42). Officer Brown then asked the defendant, "what did you do to this guy?" (11/18/25 tr at 15-16, 33; Brown BWC at 3:42-3:43). The defendant responded, "this fucking guy attacked me, the doctor is my witness. No, I'm rinsing because I got pepper sprayed" (Brown BWC at 3:43-3:48). Officer Brown remarked, "Yo, it's always something with you man," to which the defendant replied in sum and substance that the other individual attacked him (Brown BWC at 3:48-3:56). 
The following exchange then occurred:
Officer: Ok, so what did he do? Come outside.Defendant: Check the cameraOfficer: Come outside [the bathroom] and talk to us.Defendant: Wait a minute. I got fucking pepper sprayed. Do you see my fucking eyes?Officer: So we have EMS coming to help you out. Defendant: No, I don't need fucking EMS. The doctor said to put water in my eyes. (Brown BWC at 3:56-4:4:07). 
At this point, two women, later learned to be M.C. and Y.C., are heard on the BWC yelling, "he sprayed us, he sprayed us" (Brown BWC at 4:08-4:40). The defendant makes further statements in Spanish in response to the two women (id.).
Once the defendant exited the bathroom, he was directed to sit in a chair (11/18/25 tr at [*3]15-16, 33-34; see Brown BWC 4:52-4:56). The defendant accused the officer of pushing him and made several statements in that regard (see Brown BWC 4:56-5:16). As reflected on Officer Brown's BWC, Officer Zubyk noticed something and asked, "what is that?" and the defendant responded, in sum and substance, "it's a gun, oh my god, it's a little knife . . . a fucking box cutter" (Brown BWC at 5:16-5:24). Officer Brown then asked the defendant to give his side of the story (id. at 33-35). The defendant explained what happened while the officer interjected with questions (see Brown BWC at 5:24-6:06). After the sergeant arrived on scene, the defendant was asked to "explain the story one more time from the beginning" and the defendant complied (Brown BWC at 6:06-11:16). At the time of this interaction, there were approximately five other officers present (id. at 16). All officers' firearms were holstered, and no threats or promises were made to the defendant (id. at 16-17, 34). The defendant was not advised of his Miranda rights at any point on May 13, 2025 (id. at 45-46).
Shortly thereafter, Sergeant Karimov, a supervising officer, instructed Officer Brown to place the defendant under arrest based on information that the defendant had assaulted multiple individuals (11/18/25 tr at 17, 35). The defendant was arrested and subsequently transported by ambulance to a hospital since he indicated that he had also been pepper sprayed (id. at 17, 38).
At the hospital, Officer Brown conducted a search of the defendant's person and recovered a powdery substance from the defendant's right sock, which the officer believed to be cocaine (11/18/25 tr at 17-18). A photograph of the recovered substance was admitted into evidence as People's Exhibit 1. 
Officer Brown also recovered pepper spray from inside the defendant's bag, which had been handed to him by Officer Zubyk (id. at 19). An 8.5-by-11-inch photograph of the pepper spray was admitted into evidence as People's Exhibit 2.
Police Officer Olena ZubykPolice Officer Olena Zubyk has been employed by the New York City Police Department for approximately five years (12/17/25 tr at 4). The court credits Officer Zubyk's testimony to the extent indicated herein.
On May 13, 2025, Officer Zubyk was working in uniform with her partner, Officer Thomas Brown, in a marked vehicle (12/17/25 tr at 6-7). At approximately 10:13 a.m. that day, Officer Zubyk received a phone call of an assault in progress on Coney Island Avenue in Kings County (id. at 7). According to Officer Zubyk, a description of the suspect was transmitted over the radio, but the specifics of the description were not elicited during the officer's testimony (id. at 15, 17). 
Officer Zubyk's interactions on May 13, 2025, were recorded on BWC footage, a copy of which was admitted into evidence as People's Exhibit 4. 
Officer Zubyk and her partner responded to the Coney Island Avenue location and were approached by an unidentified male who stated that he had been pepper sprayed (12/17/25 tr at 7). The individual did not know what kind of spray was used and did not report any resulting pain (id. at 14-15). "From a distance," Officer Zubyk observed the individual direct her partner to a medical center "three doors" away "where the person that sprayed him went" (id. at 7-8, 15-16). The individual did not provide the officers with a description of the suspect (id. at 15). 
At the scene, Officer Zubyk spoke with a woman named S.E., but the officer could not recall the specifics of their conversation (12/17/25 tr at 16-17). Officer Zubyk's BWC reflects [*4]that S.E. informed her that a guy was throwing bricks over the top of the store she owns to wake up his brother (Zubyk BWC at 1:46-2:19). Once the emergency medical technician arrived, S.E. excused herself from Officer Zubyk and disappeared into the store (Zubyk BWC at 2:14-2:19). After speaking with S.E., Officer Zubyk walked into the medical center where she observed her partner "with the person that [the] complainant stated that sprayed him" (id. at 7-8, 18). She later learned the person to be Leonardo Morales, whom she identified in court as the defendant (id. at 8). The defendant was in the bathroom washing his eyes (id. at 18). Officer Brown directed the defendant out of the bathroom and told him to sit down (id. at 18). At this point, there were five officers inside the medical center with the defendant (id. at 18).
Officer Zubyk then spoke with two complainants, M.C. and Y.C., from the doorway of the medical center (12/17/25 tr at 8-9, 18-19). The first question the officer asked them was "he sprayed you?" (id. at 19; Zubyk BWC at 9:06-9:15). According to the officer, while neither complainant had provided a description of the perpetrator, they observed the defendant through a glass window and pointed him out as the person who pepper sprayed them (12/17/25 tr at 19-20). At the time, the defendant was the only civilian in the medical center and was surrounded by officers (id. at 20).
While on scene, a civilian recovered a bottle of pepper spray from the ground and handed it to Officer Zubyk, stating that it was the bottle the defendant had used to spray the complainants (12/17/25 tr at 9). Officer Zubyk placed the pepper spray inside the defendant's backpack and gave the backpack to Officer Brown (id. at 9).
Officer Zubyk testified that she did not question the defendant about the substance of the alleged incident, did not make any threats or promises to him, and observed that all officers' firearms remained holstered during the encounter (12/17/25 tr at 9-10).
Sergeant Umid KarimovSergeant Umid Karimov has been employed by the NYPD for approximately eight years (12/17/25 tr at 23). The court credits Sergeant Karimov's testimony to the extent indicated below. 
On May 13, 2025, Sergeant Karimov was working in uniform with his partner, Officer Lynch (12/17/25 tr at 24-25). At approximately 10:13 a.m. on that date, Sergeant Karimov received multiple calls reporting an assault in progress on Coney Island Avenue in Kings County (id. at 25). On re-direct examination, Sergeant Karimov testified for the first time that a description of a "male Hispanic wearing all black" was transmitted when he received the notification for this incident (id. at 44).
Sergeant Karimov's interactions on May 13, 2025, were captured on BWC, a copy of which was admitted into evidence as People's Exhibit 5.
Sergeant Karimov responded to the location and, upon arrival, observed other officers inside what he described as a "little clinic" (12/17/25 tr at 25). He entered the medical center and observed an individual detained inside, whom he identified as the defendant (id. at 25-26). 
Inside the medical center, Sergeant Karimov was approached by a female witness, S.E., accompanied by an individual who identified himself as "the ambulance" (Karimov BWC at 2:08-2:17). The individual asked the sergeant what substance was sprayed so that he could treat a complainant (id.). Sergeant Karimov then asked, "is this the person?" and S.E. responded, "yes, it is, I was there . . . that is the guy" (Karimov BWC at 2:14-2:23). S.E. explained that [*5]she was the one who called the police and described what happened (12/17/25 tr at 27, 41-42; Karimov BWC at 2:35-3:20). 
Officer Karimov then asked the defendant where the pepper spray was, and the defendant responded, "I don't know, on the street" (id. at 26-27; Karimov BWC at 3:26-3:29).
Next, S.E. directed the sergeant to her store where he met with a complainant named J.O. (12/17/25 tr at 27, 42-43). The sergeant observed that J.O. had bloodshot eyes and a reddened face (id. at 27). J.O. explained that he had been involved in a physical altercation during which he was pepper sprayed (id. at 27). J.O. did not, however, provide any description of the perpetrator (id. at 42-43). After speaking with S.E. and J.O., the sergeant "instructed his colleagues to place [the defendant] under arrest" (id. at 29, 44). 
While the defendant was being placed under arrest, a male individual walked into the clinic holding a pepper spray bottle (id. at 28-29; Karimov BWC at 7:15-7:18). Although the sergeant testified that the individual stated that "this was the pepper spray that the defendant used to spray everyone" the BWC footage indicates that the individual merely stated that he saw the defendant toss the bottle (compare 12/17/25 tr at 28-29, with Karimov BWC at 7:15-7:28).

 Conclusions of Law
At a suppression hearing, the People bear the initial burden of showing, by credible evidence, the lawfulness of the police conduct (see People v Hernandez, 40 AD3d 777, 778 [2d Dept 2007]; People v Moses, 32 AD3d 866, 868 [2d Dept 2006]; see also People v Wise, 46 NY2d 321, 329 [1978]; People v Whitehurst, 25 NY2d 389, 391 [1969]). In evaluating the police action, the court must determine whether it was justified at its inception and whether it was reasonably related in scope to the circumstances at the time (see People v De Bour, 40 NY2d 210, 222 [1976]). If the People satisfy their initial burden, the defendant "bears the ultimate burden of proving that the evidence should not be used against him" (People v Berrios, 28 NY2d 361, 367 [1971]).
The Huntley PortionTurning first to the Huntley portion, the People bear the burden of proving beyond a reasonable doubt that the statements made by the defendant were voluntary (see People v Huntley, 15 NY2d 72, 74 [1965]). A defendant who is in custody may not be interrogated by law enforcement without being advised of his constitutional rights (Miranda v Arizona, 384 US 436 [1966]). "Both the elements of police custody and police interrogation must be present before law enforcement officials constitutionally are obligated to provide the procedural safeguards imposed upon them by Miranda" (People v Huffman, 41 NY2d 29, 33 [1976]). 
With respect to the defendant's noticed statements, the BWC footage admitted into evidence show that the encounter with the defendant quickly unfolded and encompassed numerous statements and colloquies. The court will consider each in turn to determine whether the defendant was subjected to custodial interrogation. 
"The standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (People v Paulman, 5 NY3d 122, 129 [2005]). When Officer Brown first encountered the defendant in the bathroom and requested that he "come on out," the defendant was not in custody. The defendant refused the officer's request, instead telling him to "wait a second" and to "relax." Further, as [*6]reflected on the officer's BWC, the defendant was able to move freely about the bathroom. No weapons were drawn, no threats or promises were made, and relatively few officers were present in the medical facility at this time. Therefore, a reasonable person innocent of wrongdoing would not have believed that his freedom was restrained in any significant way (see People v Rodney P., 21 NY2d 1, 10 [1967] [questioning defendant in his backyard regarding his whereabouts did not constitute custodial interrogation]). Moreover, at the time, the defendant had not been subjected to any police questioning or its functional equivalent. The evidence establishes that in response to being asked to "come on out" the bathroom, the defendant stated, "hold on, I got pepper spray in my eyes, hold on, give me a second. I'm not hiding from nobody . . . I got a doctor appointment . . . I'm here to see the doctor . . . I have high blood pressure. I harmed nobody." There is no proof before this court from which to conclude that the officer knew or should have known that asking the defendant to step out of the bathroom was likely to elicit a response concerning the incident (see People v Rivers, 56 NY2d 476, 479 [1982] ["not every comment made by a police officer in response to an inquiry by the defendant can be said to constitute interrogation, merely because it is followed by an incriminating statement from the defendant"]). Rather, the defendant's statements were spontaneously made and are therefore admissible (see People v Grimaldi, 52 NY2d 611, 617 [1981] [spontaneous statement defined as "a blurted out admission, a statement which is in effect forced upon the officer"]; People v Maerling, 46 NY2d 289, 302-303 [1987] [spontaneous statement defined as one that is "not the result of inducement, provocation, encouragement or acquiescence"]).
While the defendant was still in the bathroom, Officer Brown asked, "what happened? what did you do to this guy? what did he do to you?" and the defendant responded, in sum and substance, that he was attacked and pepper sprayed. As discussed above, at the time of these statements, the defendant was moving about the bathroom and not in custody. Further, it is generally permissible for police to ask preliminary questions on the scene to clarify or inquire as to what is transpiring (see People v Johnson, 59 NY2d 1014, 1016 [1983] [police may ask questions to clarify a volatile situation without administering Miranda warnings]; People v Rifkin, 289 AD2d 262, 262-263 [2d Dept 2001] ["police may ask a suspect preliminary questions at a crime scene in order to find out what is transpiring"]). At this point of the encounter, the police were aware of an assault with pepper spray and still uncertain as to whether the defendant was a suspect or potential complainant. Thus, the officer asking "what did you do to this guy?" and "what did he do?" was "an attempt to clarify the situation confronting the police" (People v Valentin, 118 AD3d 823, 824 [2d Dept 2014] [officers question of "what happened" did not amount to interrogation where officer arrived on scene in response to a report of a dispute with knife and found two wounded men]; see People v Huffman, 41 NY2d 29, 34 [1976] [officer's question "what are you doing back here?" upon observing defendant engage in highly suspicious behavior was designed to clarify the situation]). Accordingly, these statements are admissible.
Once the defendant exited the bathroom, he was confronted by an increasing number of uniformed officers inside the medical facility and near its exits. Further, he was physically guided into a seat. While not handcuffed, the defendant was effectively restricted in his movement. A reasonable person in the defendant's position would not have felt free to leave (see People v Trice, 213 AD3d 954, 956 [2d Dept 2023] [reasonable person would not have felt free to leave where location blocked by 10 police vehicles and multiple officers were present]). Under the circumstances presented, the defendant was in "custody" within the meaning of [*7]Miranda (see Rodney P., 21 NY2d at 9 ["Custody occurs if the suspect is physically deprived of his freedom of action in any significant way or is led to believe, as a reasonable person, that he is so deprived"]). 
As the defendant was directed towards a seat, he accused the officer of pushing him and made several statements to that effect. The defendant's statements regarding the officer pushing him were not made in response to any police questioning or its functional equivalent, and are therefore admissible as spontaneous statements (see People v Tavares-Nunez, 87 AD3d 1171, 1172 [2d Dept 2011] [volunteered statements are admissible even if the defendant was "in custody and unwarned"]; People v Simmons, 210 AD2d 441, 442 [2d Dept 1994] ["Statements made spontaneously to police officers are admissible, even if the suspect is in custody"]). 
After the pushing exchange, Officer Zubyk asked the defendant, "what is that?" which led to the defendant removing what appears to be a pocketknife clipped to his pants. The public safety exception to the Miranda requirement permits law enforcement to ask necessary questions to secure a police officer's safety or the safety of the public (see New York v Quarles, 467 US 649 [1984]; People v Jenkins, 208 AD2d 459, 460 [1st Dept 1994] [Miranda warnings not required when officer conducting a pat-down of defendant asked him whether he had anything on his person that might cut the officer]). Officer Zubyk's question regarding the pocketknife falls within the public safety exception to the Miranda rule and the defendant's statement in response is therefore admissible (see People v Ingram, 177 AD2d 650, 651 [2d Dept 1991] [defendant's response admissible where question was "prompted by a concern to secure the safety of the investigating officers and the safety of the public and was not solely motivated for the purpose of eliciting testimonial evidence"]). 
While the defendant sat in the medical center, Officer Brown engaged him in further questioning, and after the sergeant arrived, asked the defendant to recount his version of events from the beginning. While the police may ask preliminary questions to clarify or inquire as to what is transpiring on the scene, they may not ask such questions "where criminal events have been concluded and the situation no longer requires clarification of the crime or its suspects" (People v Rifkin, 289 AD2d 262, 263 [2d Dept 2001]). At this point, the need for clarification had dissipated, as two women had already accused the defendant of being the individual who pepper sprayed them. In addition, the defendant had been removed from the bathroom, directed to sit, and was surrounded by multiple officers, thereby significantly restricting his freedom of movement. At this juncture, the defendant was subjected to custodial interrogation in the absence of Miranda warnings. Accordingly, these statements must be suppressed.
The defendant continued to make statements while being handcuffed and placed against the wall, and thereafter while being escorted from the medical center and transported to the hospital. These statements were not the product of police questioning or its functional equivalent. Rather, this overly talkative defendant made numerous spontaneous, unprompted statements, without any inquiry by the police or its functional equivalent. It is well settled that "[t]he police are not obligated to silence a talkative defendant" (People v Krom, 61 NY2d 187, 199 [1984]). As such, the motion to suppress these statements are denied. 
The Wade PortionIn this case, the People served notice of a "point-out" identification of the defendant made by two witnesses to Officer Brown on May 13, 2025. The defense moves to preclude any [*8]identifications outside of the scope of the People's notice, including any identifications made to Officer Zubyk.
CPL section 710.30 is a statute designed to afford the defendant a pretrial opportunity to challenge "the reliability of his identification by others" (People v Lopez, 84 NY2d 425, 428 [1994]). To that end, the People are "required to inform [the] defendant of the time, place and manner in which the identification was made" (id.). Here, the People satisfied the statute's notice requirement notwithstanding their failure to identify by name the two identifying witnesses. The notice adequately set forth the type of identification procedure, point-out identifications; the date and approximate time, May 13, 2025 at approximately 10:30 a.m.; and the officer to whom the identification was purportedly made, Officer Thomas Brown. Accordingly, the notice was sufficient under CPL section 710.30 (see People v East, 174 Misc 2d 374, 379 [Monroe County Ct 1997] [although witness' identity was not provided, People's notice setting forth the time, place and manner of the identification procedure was sufficient]; People v Bae, 164 Misc 2d 669, 671 [Sup Ct, Queens County 1995] [notice sufficient where People indicated date and manner of identifications along with number of identifying witnesses, notwithstanding the absence of the witnesses' names]; see also People v Owens, 190 Misc 2d 49, 52 [Crim Ct, Queens County 2001] ["while it is 'better practice' to name the identifying witness in the 710.30 notice, the failure to do the same alone is not fatal and does not render the notice insufficient"]). Moreover, the People submit, and the defense does not dispute, that in response to a request from defense counsel, the People provided the names of M.C. and Y.C. as the witnesses who identified the defendant (see 12/17/25 tr at 30). 
Contrary to the People's representation, the hearing evidence establishes that the identifications by M.C. and Y.C. were made to Officer Zubyk, and not to Officer Brown. As reflected on Officer Zubyk's BWC, she steps out of the medical center and asked whether the defendant was the individual who had committed the offense, and M.C. and Y.C. responded in the affirmative. Notwithstanding that the notice listed Officer Zubyk's partner as the officer to whom the identifications were made, the defendant had notice of the time, place and manner of the identifications as well as the number of witnesses the People intended to offer at trial to testify that they had identified the defendant as the perpetrator (cf. People v Ocasio, 183 AD2d 921 [2d Dept 1992] [hearing court properly allowed People to amend the 710.30(1)(b) notice to replace the incorrect name of the identifying witness as such did not change the substance of the notice, and the defendant was in no way prejudiced]). Moreover, the defendant had an opportunity to test the reliability of those identifications at the hearing. For example, on cross-examination, defense counsel asked Officer Zubyk detailed questions about whether M.C. and Y.C. had given any description of the suspect (see 12/17/25 tr at 19-20). Where, as here, a defendant has received a pretrial hearing which included an exploration of the witnesses' identifications, any insufficiency in the notice does not require preclusion (see People v Smalls, 145 AD3d 802, 802 [2d Dept 2016]; People v Alcantara, 78 AD3d 721, 722 [2d Dept 2010]). 
The identification purportedly made by S.E. to Sergeant Karimov, however, warrants a different conclusion. The People failed to provide notice of this identification as required by CPL section 710.30(1)(b); that is, they neither informed the defendant of a third identification nor did they provide S.E.'s name as an identifying witness. As such, the defendant moved to preclude the identification for lack of notice. Further, unlike with the cross-examination of Officer Zubyk, the defendant did not ask any questions regarding any purported identification made by S.E. Therefore, it cannot be said that the defense waived its preclusion argument (see [*9]People v Amparo, 73 NY2d 728, 729 [1988] [waiver rule inapplicable where defense counsel moved only for preclusion of the evidence due to untimely or lack of notice]; but cf. CPL § 710.30[3] [improperly noticed evidence may be deemed admissible if defendant moves to suppress such evidence]). Accordingly, the identification made by S.E. to Sergeant Karimov must be precluded.
Turning back to the identifications of the defendant by M.C. and Y.C., the evidence before the court reflects that while the police were inside the medical center investigating, the two women entered the medical center of their own accord and exclaimed that the defendant had pepper sprayed them. These identifications were not police-arranged and therefore fall outside the scope of CPL section 710.30 (see People v Dixon, 85 NY2d 218, 223 [1995] [identifications resulting from mere happenstance are not police arranged]). Instead, they constituted spontaneous and unavoidable identifications arising from "a fast-paced, uncontrollable situation" (People v Clark, 85 NY2d 886, 889 [1995]).
Subsequent to the non-police arranged identifications, M.C. and Y.C., in response to Officer Zubyk's question "did he spray you?" responded affirmatively and pointed out the defendant as the person who pepper sprayed them. " 'At-the-crime-scene civilian showup identifications are not presumptively infirm' and are permissible 'if exigent circumstances require immediate identification, or if the suspects are captured at or near the crime scene and can be viewed by the witness immediately' " (People v Wright, 42 NY3d 708, 719 [2024]). Here, the identifications were conducted in close geographic and temporal proximity to the crime and were part of "one unbroken chain of events" (People v Duuvon, 77 NY2d 541, 544-545 [1991]). Further, standing alone, the fact that the defendant was in the presence of police officers does not render the show-up identification impermissibly suggestive (see People v Gonzalez, 57 AD3d 560, 561 [2d Dept 2008] ["defendant handcuffed and standing in front of a police car while in the presence of uniformed police officers does not render the show-up unduly suggestive"]; People v Jay, 41 AD3d 615, 615 [2d Dept 2007] ["the identification procedure was not rendered unduly suggestive merely because the defendant was handcuffed and in the presence of uniformed police officers when he was displayed to the complainant"]; People v Loo, 14 AD3d 716, 716 [2d Dept 2005] ["show-up identification, which occurred within four blocks of a burglary of one of the complainant's homes, within an hour of that burglary, and within minutes of the defendant's arrest, was not unduly suggestive even though the defendant was handcuffed and in the presence of uniformed officers"]). As such, the People have met their burden of demonstrating that identification procedure was not unduly suggestive (see People v Ortiz, 90 NY2d 533, 537 [1997] ["Proof that the showup was conducted in close geographic and temporal proximity to the crime will generally satisfy ... the People's burden" of showing that a showup procedure was not unduly suggestive]).
Accordingly, the defendant's motion to suppress the identifications made by M.C. and Y.C. is denied.
The Dunaway PortionIn evaluating whether the police conduct culminating in the defendant's arrest was supported by probable cause, the court applies the graduated framework set forth in People v De Bour (40 NY2d at 210).In People v De Bour, the Court of Appeals set forth a four-level analysis to evaluate street encounters with the police (40 NY2d at 222-223). The first level permits an officer to approach an individual to request information so long as the request is [*10]supported by "some objective credible reason for that interference not necessarily indicative of criminality" (id. at 223). The second level allows an officer to further inquire and "interfere with a citizen to the extent necessary to gain explanatory information, but short of a forcible seizure" (id.). At the third level, officers may forcibly stop and detain an individual upon reasonable suspicion that the person has committed, is committing, or is about to commit a felony or misdemeanor. The fourth level permits officers to arrest a person upon probable cause that the person has committed a crime. Under that rubric, each progressive level authorizes a greater police intrusion and therefore requires a greater degree of suspicion (see People v Hollman, 79 NY2d 181, 185 [1992]).
The officers' interactions on May 13, 2025, were the product of quickly unfolding events. Here, the officers arrived at the Coney Island Avenue location in response to a radio call of an assault in progress involving pepper spray. Although Officer Zubyk testified that a description of the suspect was transmitted over the radio, and Officer Brown stated that the defendant "matched the description," the record does not support that any meaningful or particularized description was actually conveyed to the responding officers by any witness or by radio transmission. To the extent the court credits Sergeant Karimov's testimony that a description of a "male Hispanic wearing all black" was provided, such information constitutes, at most, a generalized description (see People v Polhill, 102 AD3d 988, 989 [2d Dept 2013] [complainant's description of the perpetrators as " 'wearing dark clothing,' one taller than the other, and one with a hood" too vague to support reasonable suspicion]; see also People v Thorne, 207 AD3d 73, 75-78 [1st Dept 2022] [description of "black male taller than she, perhaps five feet, eight inches" too vague and general to supply reasonable suspicion"]).
Upon arrival at the scene, Officer Brown was immediately approached by an unidentified male who reported that he had been pepper sprayed and directed the officer's attention both to a spray bottle on the sidewalk and to a nearby medical center where the alleged perpetrator was purportedly located. Officer Brown was permitted entry into the medical center by a medical professional who indicated that "he is in the bathroom." As reflected on Officer Brown's BWC, the defendant was the only individual observed inside the bathroom area. At this point, the police had a founded suspicion that criminal activity was afoot which authorized a level two, common law right to inquire (see People v Parker, 32 NY3d 49, 56 [2018] [radio run of burglary in progress along with encounter with defendants at the reported address five minutes later and no other persons in area supported founded suspicion of criminal activity]; People v Benjamin, 51 NY2d 267, 270 [1980] [a radio call of "men with guns," standing alone, satisfies at most a level two, common law right to inquire]; People v Stewart, 41 NY2d 65, 69 [1976] ["where an anonymous phone tip giving a general description and location of a 'man with a gun' is the sole predicate, it will generate only a belief that criminal activity is afoot"]). 
At a level two, the police have "the common-law power to inquire for purposes of maintaining the status quo until additional information can be acquired" (Stewart, 41 NY2d at 69). Upon encountering the defendant in the bathroom, Officer Brown directed him to step out of the bathroom and proceeded to ask, in substance, "What happened? What did you do to this guy?" Although the defendant initially resisted stepping outside and explained that he had pepper spray in his eyes, was present for a doctor's appointment, and "harmed nobody," he nonetheless engaged with the officer's inquiry and provided an account that he had been attacked and was acting in self-defense. 
Although the officer's questions appeared accusatory in nature, they were a proper [*11]exercise of the officer's common law right to inquire and lacked "overbearing police pressure" (Hollman, 79 NY2d at 193 [questions regarding the ownership of bags were proper level two questions where officer believed bags to contain narcotics]). Moreover, given the quickly unfolding nature of the investigation and information already received, the officers possessed a founded suspicion of criminality sufficient to justify these limited, explanatory inquiries including Officer Brown's follow-up question, "Ok, so what did he do?" (see Hollman, 79 NY2d 181, 191 [1992] [in a level two encounter, "officer's questions become extended and accusatory and the officer's inquiry focuses on the possible criminality of the person approached"]; De Bour, 40 NY2d at 225 ["police-citizen encounters are dynamic situations during which the degree of belief possessed at the point of inception may blossom by virtue of responses or other matters which authorize and indeed require additional action as the scenario unfolds"]). 
The encounter progressed to a level three intrusion when the defendant was ultimately removed from the bathroom area and directed to sit down while surrounded by approximately six uniformed officers. At the third level, police may forcibly stop or detain an individual upon reasonable suspicion that the person has committed, is committing, or is about to commit a crime (see CPL § 140.50[1]; De Bour, 40 NY2d at 223). While Officer Brown was speaking with the defendant — who admitted that there had been an altercation and that he had used pepper spray in self-defense — M.C. and Y.C. were heard on BWC yelling, "he sprayed us." Although those complainants had not provided any other information regarding the incident, their specific accusation captured on the BWC, materially strengthened reasonable suspicion that the defendant had committed a crime. These collective facts, viewed objectively and in their totality, justified the officers in detaining the defendant for further investigation.
Finally, the record demonstrates that the officers possessed probable cause at the time Sergeant Karimov directed that the defendant be placed under arrest. Probable cause exists where the facts and circumstances known to the officers would lead a reasonable person to believe that an offense has been committed and that the defendant committed it (see People v Ortiz, 229 AD2d 451, 452 [2d Dept 1996]). Here, by the time of arrest, the police were responding to multiple reports of an assault involving the use of pepper spray at a specific location. Upon arrival, an individual reported that he had been pepper sprayed and directed officers to the nearby medical facility where the perpetrator had gone. Inside that location, officers encountered the defendant in close temporal and geographic proximity to the reported incident, observed him flushing his eyes, and heard contemporaneous statements from individuals indicating that a spraying had occurred. Additionally, Sergeant Karimov observed one complainant, J.O., to have bloodshot eyes and a red face consistent with recent exposure to some noxious substance. 
Under the totality of the circumstances including the radio transmissions, the initial report from the male complainant on scene, the defendant's presence at the precise location identified, the physical condition of complainant J.O., the identifications by complainants M.C and Y.C., and the defendant's own statements that he was involved in a physical altercation involving pepper spray, the officers possessed probable cause to believe that the defendant had committed an assault involving pepper spray (see People v Bigelow, 66 NY2d 417, 423 [1985] ["Probable cause does not require proof sufficient to warrant a conviction beyond a reasonable doubt but merely information sufficient to support a reasonable belief that an offense has been or is being committed"]). 
Under the graduated analysis mandated by De Bour, each stage of the police encounter [*12]was supported by the requisite level of suspicion, and the arrest of the defendant was supported by probable cause. Accordingly, the defendant's motion to suppress evidence as the fruit of an unlawful arrest is denied.
The Mapp PortionWith respect to the tangible evidence, the court first turns to the recovery of the pepper spray. A defendant who seeks suppression of tangible evidence must first establish "standing by demonstrating a legitimate expectation of privacy in the premises or object searched" (People v Ramirez-Portoreal, 88 NY2d 99, 108 [1996]; see People v Rice, 204 AD3d 834, 836 [2d Dept 2022]). In assessing whether a defendant has met this burden, the court must determine if the defendant subjectively exhibited an expectation of privacy in the place or item searched, and whether society generally recognizes that expectation of privacy as reasonable under the circumstances (see People v Burton, 6 NY3d 584, 588 [2006]; Ramirez-Portoreal, 88 NY2d 99 at 108; Rice, 204 AD3d at 836). The defendant "is entitled to rely on the People's proof to demonstrate standing" (Burton, 6 NY3d at 588; see CPL § 710.60[1]; Ramirez-Portoreal, 88 NY2d at 109 [standing "requires the defendant to establish, by defendant's own evidence or by relying on the People's evidence" a legitimate expectation of privacy]). Once the defendant has established standing, the People must show, as relevant here, that the defendant's action in discarding the property was a voluntary and intentional act (Ramirez-Portoreal, 88 NY2d at 108). 
Here, the record establishes that the pepper spray bottle was recovered not from the defendant's person or any area over which he maintained control. Rather, the pepper spray was retrieved by a civilian who stated that he witnessed the defendant toss it. These circumstances "reveal a purposeful divestment of possession of the item" recovered (Ramirez-Portoreal, 88 NY2d at 110; see People v Hogya, 80 AD2d 621 [2d Dept 1981] [when an accused "abandons property, there is no search or seizure"]). Moreover, the BWC reveals that the pepper spray was discarded on the public sidewalk prior to the police arriving. As such, the defendant lacks standing to challenge its seizure (see People v Delosanto, 276 AD2d 366 [1st Dept 2000] [no standing to challenge recovery of backpack left "under a station wagon parked in a shopping center, whereupon defendant walked two blocks away and entered a store"]; People v Stevenson, 273 AD2d 826, 827 [4th Dept 2000] [defendant lacked standing where he abandoned gun on the street before any contact with the police]). "Where one abandons or discards property one cannot later complain because of subsequent seizure of the property by the police and because of its subsequent use against him in court" (People v Prisco, 61 Misc 2d 730, 733-734 [Sup Ct, Bronx County 1969]). 
The court next turns to the recovery of the alleged cocaine from the defendant's person at the hospital. Unlike the pepper spray bottle recovered from a public location, the substance at issue here was recovered from the defendant's person, specifically, from his sock. 
Where, as here, the police have probable cause to arrest, they are authorized to conduct a warrantless search of said person and the area within his immediate control (see People v Smith, 59 NY2d 454, 458 [1983] ["probable cause to believe that the person arrested has committed a crime will justify the search of his person"]; People v Hill, 148 AD2d 546, 547 [2d Dept 1989]). Here, the defendant was lawfully arrested at the scene based upon probable cause that he had committed an assault with pepper spray. He was then transported by ambulance to the hospital [*13]for medical treatment, at which point Officer Brown conducted a search of his person and recovered a powdery substance from his sock. The temporal and spatial proximity of the search to the arrest, and the fact that the defendant remained in continuous police custody, render the search a valid search incident to arrest. The recovery of the substance from the defendant's sock was therefore lawful, and suppression is not warranted.

 CONCLUSION
For the reasons set forth above, the defendant's motion to suppress is granted in part and denied in part. The branch of the defendant's motion to suppress his statements is granted to the extent indicated herein. The branches of the defendant's motion to suppress physical evidence and the identifications made by M.C. and Y.C. are denied. The branch of the defendant's motion to preclude the identification made by S.E. is granted. 
This constitutes the Decision and Order of the court.
Dated: February 17, 2026Brooklyn, New YorkHon. Joanne D. Quiñones, J.S.C.